IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **STEVEN ANDREW CLEM,** | § | |
| | § | |
| Appellant, | § | |
| | § | |
| v. | § | Civil Action No. **3:18-CV-1200-L** |
| | § | |
| **LADAINIAN TOMLINSON and** | § | |
| **LATORSHA TOMLINSON,** | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER

Steven Andrew Clem ("Mr. Clem," "Appellant," or "Defendant-Debtor") appeals the bankruptcy court's January 3, 2018 Final Judgment that was entered in Adversary Case No. 17-03021-sgj after a trial of the adversary proceeding[1] was conducted and Mr. Clem's postjudgment Motion for Reconsideration was denied. Mr. Clem appeals the award in favor of LaDainian and LaTorsha Tomlinson ("the Tomlinsons," "Appellees," or "Plaintiffs-Creditors") of $664,590.93 in damages determined by the bankruptcy court to be nondischargeable under 11 U.S.C. § 523(a)(2)(A), plus $19,384.26 in sanctions awarded by the bankruptcy court for his untimely disclosure of insurance policies on the first day of trial.

In addition, Mr. Clem appeals a number of prejudgment and postjudgment orders and rulings, as well as certain findings and conclusions entered by the bankruptcy court in the adversary

---

[1] Adversary actions are generally viewed as "stand-alone lawsuits" and treated as distinct from the underlying bankruptcy action for purposes of appeal. *In re Dorsey*, 870 F.3d 359, 362-63 (5th Cir. 2017) (citations omitted).

**Memorandum Opinion and Order – Page 1**

proceeding upon conclusion of the trial.[2]  The adversary action was brought on April 3, 2017, by the Tomlinsons against Chapter 7 debtor Mr. Clem to object to the dischargeability of a debt owed to them under a prior arbitration award ("Award" or "Arbitration Award") and judgment they obtained against Mr. Clem and his company Bella Vita Custom Homes, LLC ("Bella Vita").  After considering the matters appealed by Mr. Clem, the parties' briefs, the appellate record, and applicable law, the court, for the reasons herein explained, finds no reversible error and **affirms** the bankruptcy court's January 3, 2018 Final Judgment and all other matters appealed and briefed by Appellant.

## I.       Factual and Procedural Background

### A.       Pre-Litigation Events Relevant to the Parties' Dispute

The pertinent facts regarding the parties' business relationship and the custom home construction project ("Project") that preceded and gave rise to the adversary proceeding brought

---

[2] According to Mr. Clem's May 2, 2018 Notice of Appeal (R. 8-9), the following matters are being appealed in this case:

(1) December 21, 2017 Final Judgment (R. 12, Bankr. Doc. 75);
(2) December 21, 2017 Order Granting Plaintiffs' Motion to Amend Pleadings (R. 14, Bankr. Doc. 65);
(3) December 17, 2017 Findings of Fact and Conclusions of Law (R. 17, Bankr. Doc. 66);
(4) December 21, 2017 Order Regarding Trial Exhibit (R. 1566, Bankr. Doc. 67);
(5) March 2, 2018 Order Denying Motion to Dismiss Adversary Proceeding (R. 1943, Bankr. Doc. 90);
(6) March 2, 2018 Order Setting Phase II of the Trial (R. 1946, Bankr. Doc. 91);
(7) Bankruptcy Court's April 17, 2018 Oral Denial of Request to Amend Joint Pretrial Order (R. 1953 & 2774-2993, Bankr. Doc. 98); and
(8) April 18, 2018 Order Denying Mr. Clem's Amended Motion for Reconsideration.

This memorandum opinion and order is limited to the matters and issues appealed *and briefed*. Any issues not addressed and briefed by Mr. Clem in this appeal are **waived**.  *See In re Acosta*, 406 F.3d 367, 374-75 (5th Cir. 2005) ("An assertion that a ruling is being appealed, in the absence of any argument in the body of the brief supporting the appeal, does not preserve the issue on appeal."), *overruled on other grounds as recognized by Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 565 n.3 (5th Cir. 2016); *Bailey v. Shell Western E & P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010) ("Issues not briefed on appeal are waived."); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 796 (5th Cir. 1997) (explaining that issues not briefed are waived and will not be considered on appeal).  Citations herein to the appellate record in this case are noted as "R. __"; citations to the docket sheet for the underlying bankruptcy adversary proceeding are noted as "Bankr. Doc. __"; and citations to the docket sheet in this case appear as "Doc. __". Unless otherwise indicated, the facts referenced are undisputed.

by the Tomlinsons against Mr. Clem are summarized in the bankruptcy court's December 21, 2017

Findings of Fact and Conclusions of Law ("Findings and Conclusions") as follows:

> The Adversary Proceeding is a nondischargeability action in which section 523(a)(2)(A) of the Bankruptcy Code is at issue. It involves a contract (the "Contract") entered into on April 30, 2015, between the Tomlinsons and [Bella Vita], for a $4,483,185.72 luxury, custom-built home (the "Home") in North Texas. The Defendant-Debtor was the "chief executive officer" of the homebuilder, Bella Vita, and was also the approximately 50% owner of Bella Vita (with his father and father-in-law collectively owning the remaining 50% of Bella Vita). The Tomlinsons' Home (at 18,000 square feet) would be the largest house that Bella Vita ever contracted to build.

> Things went significantly awry with the early construction efforts on the Home. Among other things, Bella Vita admittedly undertook undisclosed/unapproved construction changes. Specifically, Bella Vita made the decision to utilize helical steel piers on the large Home—something . . . that the Defendant-Debtor and Bella Vita had no experience using in the past—instead of the concrete piers that were specified in the Contract's original design plans. Bella Vita made this decision after encountering subsurface water when drilling holes for the contemplated concrete piers . . . and after further realizing that the concrete piers would have to be "cased" because of instability in the holes Bella Vita had drilled. The Contract provided that any change in the building plans required written approval of the Plaintiffs-Creditors. Not only did Bella Vita not obtain written approval from the Plaintiffs-Creditors for the switch to helical piers (or disclose initially that helical piers were being substituted) but, while drilling for installation of the helical piers, Bella Vita and/or its subcontractors failed to locate and punctured a water line—causing extensive flooding on the building pad and adjacent land. The Tomlinsons learned (rather belatedly) about the flooding from a neighbor. In addition to these construction issues, the Tomlinsons grew frustrated with Bella Vita for its alleged failure to account for [approximately $200,000] in usages of the Tomlinsons' 10% initial deposit [of $448,318.57] and subsequent draw requests.

R. 18-19.  Appellant disagrees with the bankruptcy court's interpretation of the parties' Contract

to the extent it determined that the Contract required the Tomlinsons' written approval for all

changes in building plans, including the decision to use steel helical piers rather than concrete piers called for in the design plans.  Appellant's Br. 46, 60.

The exact date that the waterline was punctured is unclear.  R. 65 & n. 162.  Also unclear is whether Bella Vita was at fault.  *Id.*  The bankruptcy court determined that the waterline puncture and decision by Bella Vita to change to helical piers both occurred in early to mid-July 2015. Ms. Tomlinson testified that she first learned about the change to helical piers during a meeting she attended in late July 2015 with Mike Moss, Bella Vita's vice president.  On August 7, 2015, after having paid $655,318.57 toward the purchase price of their new Home, the Tomlinsons terminated the Contract with Bella Vita.

### B.      The State Court Action and Arbitration Proceedings

The Tomlinsons sued Mr. Clem and Bella Vita in state court on September 8, 2015, and the parties were ordered to arbitrate.  In the arbitration, the Tomlinsons asserted legal and equitable claims for breach of contract; breach of warranty; negligence; gross negligence; negligent representation; alleged violations of § 17.46 of the Texas Deceptive Trade Practices Act ("DTPA") for intentional misrepresentations and unconscionable or knowing violations of the DTPA for which they sought treble or punitive damages; alleged violation of  § 17.50  of the DTPA for breach of warranty; fraud; fraudulent inducement; fraud in a real estate transaction; conversion; and estoppel.  They also relied on alter ego, agency, and joint enterprise theories of recovery in seeking to hold Mr. Clem and Bella Vita jointly and severally liable.

The essence of these claims is that Mr. Clem and Bella Vita failed to comply with the parties' Contract and failed to construct the Tomlinsons' new home in a good and workmanlike manner in accordance with an engineering foundation design plan that called for installation of concrete foundation piers because ground water was a potential issue. The Tomlinsons asserted

that the Contract required Mr. Clem and Bella Vita to notify them of any proposed changes to the piers, and the substitution and installation of steel helical piers without their knowledge or consent constituted a breach of the Contract and a violation of the DTPA. The Tomlinsons similarly asserted in support of their various fraud claims that Mr. Clem and Bella Vita misrepresented or failed to make certain disclosures that led them to believe that their new home would be constructed in accordance with the Contract, and that such conduct induced them to enter the Contract.

The Tomlinsons prevailed in the arbitration and obtained an Award against Mr. Clem and Bella Vita, jointly and severally, in the total amount of $744,711. The Arbitration Award was confirmed and adopted into a Final Judgment Confirming Arbitration Award that was entered in state court on September 30, 2016.  R. 19-20; R. 210-31.

In their written Award dated September 16, 2016, the arbitrators denied the Tomlinsons' claims for "misrepresentation, fraud, fraud in the sale of real estate, conversion, estoppel, alter ego, and joint enterprise" based on their determination that these claims "were not sustained by a preponderance of the evidence."  R. 207.  The arbitrators also found that the actions of Mr. Clem and Bella Vita did "not constitute a knowing violation of the DTPA."  *Id.* at 206.  The arbitrators, nevertheless, concluded that the Tomlinsons were entitled to recover $677,053.50, jointly and severally against Mr. Clem and Bella Vita, because Mr. Clem's and Bella Vita's conduct, acting through Mr. Clem,  breached the parties' Contract, violated the DTPA, and was a producing cause of the Tomlinsons' economic damages, which were recoverable under the DTPA.  *Id.* at 206-07. Included in this amount was reasonable attorney's fees of $150,000 and arbitration fees or expenses totaling $28,089.20.  The $677,053.50 amount awarded against Mr. Clem and Vella Vita, jointly and severally, was broken down as follows:

| | |
|---|---|
| a) Adjusted contract balance | $26,201.82 |
| b) Charge for the helical piers | $169,875 |
| c) Removal of the helical piers | $30,300 |
| d) Repair building pad | $235,000 |
| e) Foundation design | $6,230 |
| f) Completion of building plans | $31,357.50 |
| g) Expert fees | $28,089.20 |
| h) Attorneys' fees | $150,000 |
| Subtotal: | $677,053.50 |

*Id.* at 207. In addition to this amount, Defendants-Debtors were ordered to pay $67,657.50 for arbitration costs and arbitrator fees. *Id.* In support of the Award, the arbitrators made the following factual findings:

> 1. On April 30, 2015, the Tomlinsons signed the Bella Vita Custom Homes New Construction Build on Your Lot Home Agreement with Bella Vita (the "Contract") for the construction of a residence located on lots 2005 Navasota Cove and 2007 Navasota Cove, Westlake, Tarrant County, Texas (the "Residence").
>
> 2. The Contract was a fixed-price contract in the amount of $4,483,185.72. The Contract and preliminary drawing specified concrete piers. Any change to the plans required the approval of the Tomlinsons. The Tomlinsons had the option of terminating the Cont[r]act at any time for any reason.
>
> 3. In July of 2015, while drilling for the installation of the concrete piers, Bella Vita encountered subsurface water. The drilled holes were unstable which prevented the installation of the concrete piers unless the piers were cased. Bella Vita, without the consent of the Tomlinsons, installed steel helical piers in place of the concrete piers.[3]
>
> 4. While drilling for the helical piers, Bella Vita and its subcontractors failed to locate a water line under the Residence. The water line was

---

[3] In a footnote, the Award states: "Subsurface water was not an unforeseen condition in that it was identified in the Henley Johnson Geotechnical Investigation dated June 17, 2014." *Id.* at 205 & n.1.

punctured which caused extensive flooding on the building pad and adjacent land. Bella Vita did not inform the Tomlinsons of the flooding on the day of the event. LaDamian Tomlinson was informed by a neighbor at least one day later.

5.     On August 7, 2015, the Tomlinsons terminated the Contract.

6.     At the time of the termination, the Tomlinsons had paid Bella Vita the sum of $655,318.57. The Bella Vita cost report indicated that it had costs of $698,082.01 at the time of the termination. When the cost report is adjusted to remove profit in the amount of $45,549.33 which had been claimed, and when it is reduced another $22,415.93 for a builder's risk policy that had been claimed but not purchased, prior to considering construction defects and the resulting damage, the Tomlinsons overpaid Bella Vita the sum of $26,201.82.[4]

7.     The Tomlinsons were charged $169,875 for installation of the helical piers. The helical piers were substituted without the consent of the Tomlinsons. The expert testimony raised serious doubts as to the suitability of helical piers for a new residence with the soil conditions found on the Tomlinsons' lots. The Tomlinsons paid $30,300[] to have the helical piers removed. Removal of the helical piers did not constitute economic waste. The Tomlinsons are entitled to recover the cost for the helical piers in the amount of $169,875[] and the removal cost of $30,000[].

8.     As a result of the installation of the helical piers and as a result of the punctured water line, the building pad must be torn out and replaced in lifts. The reasonable and necessary cost to do this work is $235,000[]. The Tomlinsons are entitled to recover this amount.

9.     As a result of the installation of the helical piers and as a result of the punctured water line, a new foundation design will be required to account for the changed soil conditions. The reasonable and necessary cost

---

[4] In a footnote, the Award explains that "[w]hen the [C]ontract was signed [on] April 30, 2015, it allowed Bella Vita to claim the amount of the down payment as having been earned. However, the [C]ontract also required Bella Vita to apply the amount to current draw request[s]. The money did get slightly out of balance and it has been adjusted by this award. The evidence does not support a trust fund violation." *Id.* at 205 & n.2.

to prepare the new design is $6,230[]. The Tomlinsons are entitled to recover this amount.

10.     The Tomlinsons were charged for a full set of building plans. The full set of plans was not issued at the time of the termination. The reasonable and necessary cost to complete the building plans is $31,357.50. The Tomlinsons are entitled to recover this amount.

11.     The Tomlinsons sought to acquire goods and services from Bella Vita. They are consumers within the meaning of the Texas Deceptive Trade Practices Act ("DTPA").

12.     After months of negotiations, in September of 2014, the Tomlinsons, in anticipation of signing a written contract, made a payment to Bella Vita in the amount of $448,318,57.  In March of 2015, the Tomlinsons became impatient with the progress of the project and they ordered Bella Vita to stop work on the project.

13.     Steven A. Clem ("Clem"), the President of Bella Vita, met with the Tomlinsons on several occasions from late March through the month of April 2015. He assured the Tomlinsons that he would put a full[-]time superintendent and a full[-]time project manager on the project. He further assured them that James Stokey would be a personal liaison to coordinate design selections. These representations proved to be false. The project manager and project superintendent were not on the job full[-]time. James Stokey was relocated to Austin shortly after the [C]ontract was signed.

14.     Clem and Bella Vita warranted that they would build the Improvements in accordance with first-class, custom home building practices and substantially in compliance with the plans for the foundation of the Residence, unless written approval was obtained from the Tomlinsons to change the plans. The plans called for concrete piers. Bella Vita and Clem failed to inform the Tomlinsons that steel helical piers were installed rather than concrete piers called for by the Contract plans and specifications.

15.     Clem represented that a builder's risk policy for the Residence had been purchased when, in fact, the purchase had not been made.

**Memorandum Opinion and Order – Page 8**

16.     The actions of Clem and Bella Vita, acting through Clem, violate the provisions of the DTPA and they are a producing cause of economic damages to the Tomlinsons.

17.     The actions of Clem and Bella Vita do not constitute a knowing violation of the DTPA.

18.     Clem and Bella Vita are jointly and severally liable to the Tomlinsons for the economic damages sustained by the Tomlinsons.

19.     Under the DTPA, the Tomlinsons are entitled to recover reasonable and necessary attorneys' fees in the amount of $150,000 and reasonable and necessary expert fees in the amount of $28,089.20.

20.     The evidence supports both a breach of contract cause of action and a DTPA cause of action against Bella Vita. The economic damages are addressed as DTPA violations against both Bella Vita and Clem.

*Id.* at 204-07.

As noted above, the arbitrators found that Mr. Clem had told the Tomlinsons that a builder's risk policy for the Residence had been purchased even though such insurance had not been purchased.  *Id.* at 206.  Whether Bella Vita had obtained builder's risk insurance as required by the Contract or had any other insurance that might cover the Tomlinsons' alleged damages continued to be an issue in the subsequent bankruptcy and adversary proceedings involving Mr. Clem and Bella Vita, along with the issue involving the pier change.

### C.     Pretrial Proceedings in the Bankruptcy and Adversary Cases

After Mr. Clem and Bella Vista both filed for bankruptcy on December 14, 2016, under Chapter 7 of the Bankruptcy Code,[5] the Tomlinsons initiated an adversary proceeding against Mr.

---

[5] Mr. Clem's bankruptcy case was assigned the number 16-34788-sgj7.  Bella Vista's bankruptcy case was assigned the number 16-34790-mvl7.

Clem, contending that the debt owed to them, as determined by the arbitrators, should not be discharged. On May 25, 2017, the Tomlinsons filed their first amended complaint, titled "First Amended Objection to Discharge" ("Pretrial Objection") (R. 163) in which they contend that the debt owed to them is not dischargeable under 11 U.S.C. § 523(a)(2)(A) because Mr. Clem fraudulently induced them to enter the construction Contract from which the debt arose by making a number of fraudulent statements and failing to disclose certain information before the Contract was executed.

The Tomlinsons alleged that these fraudulent representations included, among other things, statements that: (1) the work performed by Bella Vita would comply with design plans; and (2) "a Builder's Risk Policy was in place on [their] project, and charging [them] for same."  R. 163. Based on this argument, the Tomlinsons sought and contended that they were entitled to have the full amount of the Arbitration Award ($744,711) declared nondischargeable.  In addition, the Tomlinsons contended in the Joint Pretrial Order, filed on August 22, 2017, that the debt owed to them was nondischargeable because Mr. Clem made representations to fraudulently induce them into entering the construction Contract.  The Tomlinsons further contended that, because Bella Vita failed to obtain both "general liability and builder's risk insurance policies of their Project" as promised by Mr. Clem, they were unable to claim and collect the Award amount under any insurance policy.  *Id.* at 444-46.

On June 30, 2017, Mr. Clem moved for summary judgment, contending that the Tomlinsons' section 523(a)(2)(A) claims were barred by res judicata or collateral estoppel. In support, he argued that the Tomlinsons' fraud claims were fully litigated and denied by the arbitrators, or they arise out of the same subject matter and could have been raised and litigated in the arbitration.  The bankruptcy court denied Mr. Clem's summary judgment motion on August

16, 2017, and set the adversary proceeding for trial. The August 16, 2017 order does not elaborate regarding the parties' arguments or the bankruptcy court's reasons for denying Mr. Clem's summary judgment motion. The bankruptcy court's Findings and Conclusions, however, address in detail Mr. Clem's res judicata and collateral estoppel defenses and the reasons why they were determined by the bankruptcy court not to be legally or factually viable.

### D.   Phase I of the Adversary Proceeding

#### 1.   Commencement of the Trial

The trial of the adversary action commenced on August 23, 2017, but it was continued as a result of Mr. Clem's testimony that Bella Vita had a commercial general liability insurance policy during the time of the construction of the Tomlinsons' home as required by the Contract, and his attorney sought to introduce evidence of such insurance. The Tomlinsons' attorney objected because this was the first time that he or his clients had ever heard anything about insurance Bella Vita may have had at the time in question.

Concerned that insurance coverage might be a key issue in the Tomlinsons' adversary proceeding that could also materially affect other creditors in the underlying bankruptcy cases initiated by Mr. Clem and Bella Vita, the bankruptcy court asked Mr. Clem and his attorney why information regarding Bella Vita's general liability and umbrella insurance that might cover creditor claims against him and Bella Vita was not previously disclosed before the trial. The bankruptcy court noted that, if this insurance information had been previously disclosed as required, the Tomlinsons and other creditors could have been investigating whether their claims were covered. The bankruptcy court also noted that, if such insurance existed and covered the Tomlinsons' claim, all of the time spent on whether the debt owed was nondischargeable because of fraud was for naught, assuming that the timeliness of any such insurance claim was not an issue

because of the defense's delay in disclosing the existence of insurance during the arbitration and adversary proceeding.

With this in mind, the focus of the proceedings on August 23, 2017, quickly turned to why Mr. Clem and his counsel failed to previously disclose information and exchange exhibits pertaining to Bella Vita's insurance in response to the Tomlinsons' written discovery requests (in the adversary case and arbitration), and as required by the bankruptcy court's scheduling order and Federal Rule of Civil Procedure 26(a)(1)(A).  The proceedings on August 23, 20217, ended with the bankruptcy court continuing the trial of the case to October 11, 2017, to give the parties time to conduct discovery regarding the insurance policies and determine whether the debt owed to the Tomlinsons might be covered by the policies. Before adjourning, the bankruptcy court also advised the parties as follows:

> [I]f the failure to disclose [the existence of insurance policies that might cover the Tomlinsons' claims] and explore that has caused unnecessary fees and delays, we are going to explore if somebody ought to get their attorneys' fees reimbursed by somebody. So, just let it be known that that is one of the many things churning through my head here if at the end of the day we find out we have insurance here that we all should have known about a long time ago.

R. 2525.

### 2.      Continuation of the Trial

The second day of trial resumed on October 11, 2017. The focus of this portion of the trial was on evidence regarding Bella Vita's insurance policies that had not been disclosed in almost two years of litigation. Mr. Clem's explanations for why he never passed any insurance information along to the Tomlinsons varied from stating that he had not seen the Requests for Production because they were handled by previous lawyers, to suggesting that he did not think the question of insurance was relevant to the lawsuit. The bankruptcy court did not accept his

explanations as credible. The bankruptcy court believed that the Tomlinsons might have focused their efforts on insurance-collection issues earlier and not pursued the section 523 Adversary Proceeding so aggressively had they known about the insurance policies. As a result, the bankruptcy court held Mr. Clem responsible for the nondisclosures and sanctioned him for failure to comply with Rule 26(a), the Alternative Scheduling Order, and the Joint Discovery Plan.

At the end of the second day of trial, the bankruptcy court identified two arguments in the Tomlinsons' theory of the case that had not specifically been addressed in their live pleadings or other pretrial filings. First, with respect to insurance, the bankruptcy court observed that the Tomlinsons had shifted from arguing about Mr. Clem's and Bella Vita's misrepresentations about obtaining insurance to cover the Project, to arguing that Mr. Clem and Bella Vita defrauded them by concealing the fact that insurance had not been obtained. Second, the Tomlinsons argued that Mr. Clem and Bella Vita fraudulently induced them to "stay in the Contract"[6] longer than they otherwise would have by concealing material information regarding the change to helical piers, the waterline puncture, and how $448,318.57 of their initial deposit was used.  In light of the bankruptcy court's observations regarding the issues tried, the Tomlinsons made an oral motion at the end of the trial on October 17, 2017, to amend their pleadings to comport with the evidence, which was opposed by Mr. Clem.

On December 21, 2017, the bankruptcy court issued its Findings and Conclusions, awarding the Tomlinsons $664,590.93 as "debt owed by the Defendant-Debtor is nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code." R. 98.

---

[6] R. 88, 90, 91, 98.

E.   **Phase II of the Adversary Proceeding (Motion to Reconsider and Reopening of the Evidence)**

In light of the bankruptcy court's observations regarding the issues tried, the Tomlinsons filed a formal posttrial Motion for Leave to Amend Complaint on October 27, 2017.  Mr. Clem opposed the motion, contending that he did not consent to these new theories and allowing them so late in the litigation would violate his right to due process. Ultimately, the bankruptcy court granted the Tomlinsons' motion, reasoning that Mr. Clem had presented new evidence and caused the new theories to be part of the proceeding. The bankruptcy court disagreed that the amendment would violate his due process rights because the matters at issue were not new to him, as the issues pertaining to the switch to helical piers, the punctured water main, and the alleged concealment of how the initial deposit was spent were "the most controversial subjects in the entire Adversary Proceeding." R. 50. The bankruptcy court, therefore, permitted the posttrial amendment of the Tomlinsons' complaint, which was docketed on December 22, 2017.

Mr. Clem filed a Motion to Reconsider on January 4, 2018, one day after the Final Judgment was entered on January 3, 2018.  On January 8, 2018, he filed an Amended Motion for Reconsideration of Order Granting Motion to Amend Pleadings, Findings and Conclusions, and Final Judgment ("Amended Motion to Reconsider") (R. 1729, Bankr. Doc. 78).

On February 28, 2018, the bankruptcy court granted a motion by Mr. Clem to reopen the evidence in the adversary proceeding ("Phase II of the trial") to allow further development of the record given the posttrial amendment of the Tomlinsons' complaint.  (R. 2220-21, Bankr. Doc. 101).  The bankruptcy court, however, limited the reopening of the record to two issues: (1) "whether there was concealment/nondisclosure of how the Plaintiffs' initial 10% deposit and two

**Memorandum Opinion and Order – Page 14**

subsequent draw requests were spent"; and (2) "whether there was concealment/nondisclosure of the usage of helical steel piers for some period of time."  R. 1946-47.

Mr. Clem's Amended Motion to Reconsider was denied on April 18, 2018, after a hearing on the motion. This and other related appeals by Mr. Clem followed.

### F.    Appeal by Mr. Clem

Mr. Clem appeals: (1) the bankruptcy court's determination that the $664,590.93 debt owed by him is nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code; (2) the sanctions imposed against him in the amount of $19,384.26 in attorney's fees for the untimely disclosure of insurance policies; and (3) denial of all relief requested by him that was not addressed. Mr. Clem requests that this court consider whether the bankruptcy court erred in the following ways by: (1) failing to dismiss the new theories of liability found by it, *sua sponte* after trial, as time-barred pursuant to Federal Rule of Bankruptcy Procedure 4007(c); (2) failing to rule that the new theories of liability do not relate back to the Tomlinsons' timely filed Complaint pursuant to Federal Rule of Civil Procedure 15(c); (3) ruling that the new theories of liability were tried by consent pursuant to Rule 15(b)(2); (4) failing to find that the new fraud by nondisclosure theories of liability were barred by collateral estoppel; (5) finding fraud by nondisclosure with respect to Bella Vita's use of the initial deposit; (6) finding fraud by nondisclosure with respect to the substitution of helical piers; (7) finding him individually liable for the new fraud theories of liability; (8) sanctioning him in the amount of the Tomlinsons' attorney's fees; (9) limiting or refusing to consider his evidence on the new theories of liability; and (10) awarding contract damages against him individually that were not proximately caused by the fraud alleged. Appellant's Br. 1-3.

Mr. Clem requests that this court enter an order: (1) "dismissing [the Tomlinson]'s claims for non-dischargeability of any damages or debt owed to [them]"; and (2) " vacating the sanctions awarded" against him.  Appellant's Br. 65.  Alternatively, he requests that this court "reverse the judgment of the bankruptcy court and remand for findings consistent with its opinion identifying the error in the bankruptcy court."  *Id.*

For purposes of this appeal, two pleadings by the Tomlinsons are relevant: (1) the First Amended Objection to Discharge ("Amended Complaint") that was filed before the trial of the adversary proceeding commenced; and (2) the Second Amended Objection to Discharge ("Second Amended Complaint") that was filed December 22, 2017.

## II.    Standard of Review

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a)(1); Fed. R. Bankr. P. 8001(a). On appeal, this court may affirm, modify, or reverse the bankruptcy court's judgment, order, or decree, or remand the matter at issue with instructions to the bankruptcy court to conduct further proceedings. Fed. R. Bankr. P. 8013. In reviewing the bankruptcy court's decisions, the district court functions as an appellate court and applies the same standards of review used by federal appellate courts when reviewing the decisions of district courts. *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). A bankruptcy court's findings of fact are subject to review for clear error, and its conclusions of law are reviewed *de novo*. *See In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003). A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been made." *In re Dennis*, 330 F.3d at 701 (citation omitted). In conducting this review, the court must give due regard to the

opportunity of the bankruptcy judge to determine the credibility of the witnesses. *Id.*; *see also In re Young*, 995 F.2d 547, 548 (5th Cir. 1993) (quoting Fed. R. Bankr. P. 8013).

## III. Discussion

Without elaborating, Appellees assert in a footnote in their response to Appellant's Brief that the appeal by Mr. Clem is untimely. Accordingly, before reaching the issues appealed, the court addresses whether it has jurisdiction over this action.

### A. Jurisdiction

Mr. Clem alleges in his Appellant's Brief (Doc. 11) that this appeal is timely, and the court has jurisdiction to hear this bankruptcy appeal under 18 U.S.C. §158(a). For support, he provides a procedural history of the events that preceded the appeal in this case, including his filing of the following four Notices of Appeal: May 2, 2018 Notice of Appeal (R. 8-11, Bankr. Doc. 104); May 7, 2018 Amended Notice of Appeal (R. 4-7, Bankr. Doc. 106); May 8, 2018 Second Amended Notice of Appeal (R. 1-3, Bankr. Doc. 107); and May 8, 2018 Notice of Appeal (Bankr. Doc. 10).[7] Mr. Clem asserts that his appeals of two formerly interlocutory orders (Bankr. Docs. 90, 91) were included in separate Notices of Appeal at the request of the bankruptcy clerk, and, as a result, three separate bankruptcy appeals were opened at the district court level and assigned to three different district court judges: Case No. 3:18-CV-1198-G; Case No. 3:18-CV-1199-B; and Case No. 3:18-CV-1200-L.

Case Nos. 3:18-CV-1198-G and 3:18-CV-1199-B were assigned, respectively, to Senior United States District Judge Joe Fish and United States District Judge Jane Boyle. Because the appeals were limited to prejudgment orders and not the Final Judgment, they were dismissed for

---

[7] The May 8, 2018 Notice of Appeal (Bankr. Doc. 10) was not included in the appellate record.

lack of jurisdiction as untimely filed.  In addition, leave had not been sought to file the interlocutory appeals, and it was determined that leave would not have been granted in any event because Mr. Clem's appeal of the bankruptcy court's Final Judgment was pending before the undersigned, and he could seek review of the orders in that same appeal.  *See Clem v. Tomlinson*, 3:18-CV-1198-G, 2019 WL 201844, at *2 (N.D. Tex. Jan. 15, 2019) (explaining that, under the final judgment appealability rule, nonreviewable interlocutory orders merge into and become reviewable in the appeal of the final judgment) (citing *Dickinson v. Auto Ctr. Mfg. Co.*, 733 F.2d 1092, 1102 (5th Cir. 1983); and *Mahogany v. Rogers*, 293 F. App'x 259, 260 (5th Cir. 2008)).

Mr. Clem alleges that this appeal, which includes his appeal of the Final Judgment, as well as other rulings and findings made by the bankruptcy court prejudgment and postjudgment, is timely because his first Notice of Appeal (R. 8-11, Bankr. Doc. 104) was filed on May 2, 2018, within 14 days after the bankruptcy court's April 18, 2018 Order, After Submission of New Evidence and Argument, Denying Defendant's Amended Motion for Reconsideration of Findings and Conclusions.

"Federal courts must be assured of their subject matter jurisdiction at all times and may question it sua sponte at any stage of judicial proceedings." *In re Bass*, 171 F.3d 1016, 1021 (5th Cir. 1999) (citation omitted). The timely filing of a notice of appeal in a bankruptcy case is jurisdictional.  *In re Dorsey*, 870 F.3d at 362.  Federal Rule of Bankruptcy Procedure 8002(a)(1) provides that a notice of appeal must be filed in the bankruptcy court "within 14 days after entry of the judgment, order, or decree being appealed." This rule applies to final orders, as well as interlocutory orders.  *In re O'Connor*, 258 F.3d 392, 398 (5th Cir. 2001).  The time for filing a notice of appeal under Bankruptcy Rule 8002, however, is tolled if a motion for relief under

Federal Rules of Civil Procedure 52, 59, or 60 is filed within 14 days after entry of the judgment.[8]

Fed. R. Bankr. P. 8002(b)(1).  In this situation, the deadline for filing a notice of appeal is 14 days

after entry of the order that disposes of any motions under Rule 59 or Rule 60.  "[W]hen an appeal

to the district court is untimely under Rule 8002(a), the district court lacks jurisdiction over the

appeal." *In re Berman-Smith*, 737 F.3d 997, 1000 (5th Cir. 2013) (citation omitted).

As indicated, Mr. Clem filed a Motion to Reconsider on January 4, 2018, one day after the

Final Judgment was entered on January 3, 2018.  On January 8, 2018, before a ruling on his original

motion for reconsideration, he filed his Amended Motion for Reconsideration of Order Granting

Motion to Amend Pleadings, Findings of Fact and Conclusions of Law, and Final Judgment

("Amended Motion to Reconsider") (R. 1729, Bankr. Doc. 78), which the bankruptcy court denied

on April 18, 2018, after agreeing on February 28, 2018, to reopen the evidence in the adversary

proceeding ("Phase II of the trial") to allow further development of the record on two issues (R.

2220-21, Bankr. Doc. 101).

---

[8] Rule 52 applies to findings and conclusions by the court.  Bankruptcy Rule 7052 makes Rule 52 applicable to adversary proceedings, and provides that, "except that any motion under subdivision (b) of that rule for amended or additional findings shall be filed no later than 14 days after entry of judgment." Fed. R. Bankr. P. 7052.  Rule 59 applies to motions for a new trial or to alter or amend a judgment. Bankruptcy Rule 9023 makes Rule 59 applicable to adversary proceedings but similarly requires motions for relief under Rule 59 to be filed within 14 days after entry of the judgment. Fed. R. Bankr. P. 9023. Rule 60(b) states that the court may relieve a party from a final judgment or order for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Bankruptcy Rule 9024 makes Rule 60 applicable to cases under the Bankruptcy Code, subject to certain exceptions that are not relevant here.  Rule 60 motions must be filed "within a reasonable time" but "not more than one year after the judgment, order, or proceeding was entered or taken."  *In re Osborne*, 379 F.3d 277, 283 & n.6 (5th Cir. 2004); *In re Renaissance Radio, Inc.*, 805 F. App'x 319, 321 (5th Cir. 2020) (quoting Fed. R. Civ. P. 60(c)).

**Memorandum Opinion and Order – Page 19**

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration; however, a motion for reconsideration "may be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment or order." *See Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004) (citing *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998)). As noted, Federal Rules of Civil Procedure 59(e) and 60(b) are made applicable to bankruptcy proceedings under Federal Rules of Bankruptcy Procedure 9023 and 9024, respectively. If a motion for reconsideration is filed within 14 days of the judgment or order of which the party complains, it is considered a request for relief under Rule 59(e); otherwise, it is treated as a Rule 60(b) motion. *Shepherd*, 372 F.3d at 328 n.1.

Mr. Clem's Amended Motion to Reconsider was filed less than 14 days after entry of the Final Judgment. Accordingly, Rule 59(e) applies notwithstanding the request in his Amended Motion to Reconsider for the court to consider his motion, "to the extent necessary, . . . as a request for relief from the judgment or other order under Fed. R. Civ. P. 60(b) and Fed. Bankr. P. 9024." Def.'s Am. Mot. Reconsider 1 & n.1 (R. 1729). Thus, Mr. Clem's deadline for filing a notice of appeal was tolled until May 2, 2018, 14 days after entry of the bankruptcy court's order denying his Amended Motion to Reconsider.

The three notices of appeal that Mr. Clem filed on May 7 and 8, 2018, were untimely and do not provide the court with jurisdiction over this appeal. Bankruptcy Rule 8002(d)(1) allows the bankruptcy court, upon a party's motion, to extend the time to appeal under certain circumstances, but Mr. Clem did not move for an extension to file a notice of appeal or to amend his first Notice of Appeal after the May 2, 2018 deadline. This, however, is not fatal to his current appeal, as his first Notice of Appeal (R. 8-11, Bankr. Doc. 104) was filed May 2, 2018, within 14 days after entry of the bankruptcy court's order denying his Amended Motion to Reconsider. His first Notice of

**Memorandum Opinion and Order – Page 20**

Appeal was thus timely filed and the court has jurisdiction over this appeal.  Moreover, all of the matters appealed in the other notices of appeal are expressly included in Mr. Clem's May 2, 2018 Notice of Appeal.  *See supra* n.1 (list of matters appealed according to May 2, 2018 Notice of Appeal).  Thus, the court determines that it has jurisdiction over this appeal despite Appellees' contention to the contrary.

### B. Issues Appealed *and Briefed* by Mr. Clem

Mr. Clem's Notice of Appeal includes a large number of issues being appealed.  Only a handful of those issues, however, was actually addressed and briefed by him. The court's discussion focuses on the issues that were briefed, but as herein explained, many of the issues raised by Mr. Clem in this appeal are waived for various reasons.

### 1. Pleading Amendment

Appellant's first, second, and third appellate arguments deal with the timeliness and propriety of allowing the Tomlinsons to amend their pleadings. Appellant argues that: (1) the Tomlinsons' new fraud theories of liability based on alleged post-contractual nondisclosure are time-barred and do not relate back, pursuant to Rule 15(c), to the Tomlinsons' prior claims that were timely pleaded; and (2) the bankruptcy court erred in concluding that the new fraud by nondisclosure theories of liability were tried by consent. For support, Appellant relies on his appellate brief that was filed in related bankruptcy appeal No. 3:18-CV-1198-G and attached as Exhibit A to his appellate brief in this case.  For the reasons that follow, the arguments made with respect to these issues in Appellant's first, second, and third points of error are **waived** for slightly different reasons.

### a.    Timeliness of the Tomlinsons' Amendment

Appellant first contends that the bankruptcy court erred in allowing the Tomlinsons' "Post-Trial" amendment that includes "the bankruptcy court's new fraud theories of liability to support non-dischargeability" because any such claims or theories are time-barred. In this regard, Appellant contends that Federal Rule of Bankruptcy Procedure 4007(c)'s sixty-day deadline to assert objections to dischargeability bars the new fraud theories because they do not relate back under Federal Rule of Civil Procedure 15(c) to the Tomlinsons' prior claims that were timely pleaded.  Citing cases from other circuits, Appellant contends that, in contrast to Rule 15's liberal pleading standard, courts strictly construe Rule 4007(c)'s sixty-amendment deadline in balancing the interplay between these two rules.

Appellant further contends that, because of Federal Rule of Civil Procedure 9(b)'s pleading specificity requirements, which also apply to the relation back doctrine, "the relation back doctrine is unavailable whe[n] new conduct of fraud, previously unpled, is alleged after the Rule 4007(c) bar deadline."  Appellant's App. 29 (Doc. 11-1).  Appellant asserts that, while the Tomlinsons' prior pleadings regarding pre-contractual misrepresentations satisfied Rule 9(b), the allegations in the Second Amended Complaint, which are based on entirely different post-contractual fraudulent nondisclosure and events, do not satisfy Rule 9(b) and, thus, do not relate back under Rule 15(c).

Bankruptcy Rule 4007(c) provides:

> Except as otherwise provided in subdivision (d), a complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). The court shall give all creditors no less than 30 days' notice of the time so fixed in the manner provided in Rule 2002. On motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision. The motion shall be filed before the time has expired.

Federal Rule of Bankruptcy Procedure 7015 pertains to amended and supplemental pleadings and expressly states that Rule 15 of the Federal Rules of Civil Procedure "applies in adversary proceedings." Thus, the liberal pleading standard under Rule 15, which provides that "leave shall be freely given when justice so requires," applies in adversary proceedings. *In re Schwager*, 121 F.3d 177, 186 (5th Cir. 1997).

Rule 15(c) applies to the relation back of pleading amendments. Under Rule 15(c), a pleading amendment relates back to the original pleading date when:

> (A) the law that provides the applicable statute of limitations allows relation back;

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).

The court, however, does not reach the merits of Appellant's contentions because "[m]issing the deadline for an objection to discharge [under Rule 4007(c)] is not a 'jurisdictional' defect and may be waived if not timely made. *See In re Whittington*, 530 B.R. 360, 396 (Bankr.

W.D. Tex. 2014) (citing cases).[9]   Recognizing this, Appellant asserts in a footnote that the bankruptcy court "refus[ed] to even obtain full briefing or hold a hearing on the issue of limitations. *See* R. 2754-2755."  Appellant's App. 27 & n.16.[10]  This citation by Mr. Clem to the appellate record in this case is to the transcript of the February 5, 2018 hearing on his Amended Motion to Reconsideration in which he sought reconsideration of the bankruptcy court's order that allowed the pleading amendment at issue, as well as the Findings and Conclusions and Final Judgment entered by the bankruptcy court in favor of the Tomlinsons.  The court has carefully reviewed the Amended Motion for Reconsideration and the entire transcript of the hearing on that motion, and, contrary to Mr. Clem's assertion, neither includes any reference to Rule 4007(c) or Rule 15(c), or any assertion by him (or his counsel) that the Tomlinsons' pleading amendment based on allegedly new fraud theories was time-barred.  *See* R. 1729-33 (Am. Mot. for Reconsideration); R. 2729-73 (Feb. 5, 2018 Hearing Tr. on Am. Mot. for Reconsideration).

During the hearing, the bankruptcy court also questioned whether the issues in Mr. Clem's Amended Motion for Reconsideration were raised timely.  *See* R. 2765.  Out of an abundance of caution, however, the bankruptcy court agreed to reopen the evidence to give Mr. Clem an opportunity to put on rebuttal evidence to address the pleading amendment and theories that

---

[9] *In re Wittington* cites the following authority for this proposition:

> *Kontrick v. Ryan*, 540 U.S. 443, 447, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004) (holding that failure to comply with Bankruptcy Rule 4004 may be waived); *id.* at 448 n.3, 124 S. Ct. 906 (acknowledging that Bankruptcy Rule 4007 establishes "essentially the same time prescriptions" for denial-of-discharge actions as Bankruptcy Rule 4004 for dischargeability-of-a-debt deadlines, and that cases concerning one rule have been applied to the other); *Owen v. Miller (In re Miller)*, 333 B.R. 368, 371 (Bankr. N.D. Tex. 2005) (applying *Kontrick* to Bankruptcy Rule 4007 context, citing to other courts that have done so, and noting that "[b]ecause the language of the two rules is virtually the same, the Court . . . concludes that the sixty-day deadline of Rule 4007(c) is not jurisdictional"), *aff'd*, No. 04-80905-HDH-7, 2006 WL 6507922 (N.D. Tex. Mar. 28, 2006).

[10] This argument was included in the brief that Mr. Clem filed in his related bankruptcy appeal, Case No. 3:18-CV-1198-G.

**Memorandum Opinion and Order – Page 24**

formed the bases for the Findings and Conclusions and Final Judgment entered against him in the Tomlinsons' favor.  *Id.*  The bankruptcy court explained the limitations on the rebuttal evidence that would be allowed for this purpose.  After identifying the two narrow issues for which evidence would be allowed—evidence of whether there was fraudulent concealment (omissions) regarding the helical piers and how the Tomlinsons' money was spent—the bankruptcy court expressly asked whether there were any other issues that needed to be addressed: "Again two narrow subjects. Am I missing something? Speak up now if you think I'm missing something."  R. 2767.

To this, Mr. Clem's counsel responded that he thought the issue regarding builder's risk insurance should also be revisited for purposes of addressing why there was a charge for insurance when none had actually been purchased.  The bankruptcy court disagreed because this issue had already been addressed at length during the trial and was the reason the trial was continued after the first day for a period of approximately two months to allow the Tomlinsons to conduct discovery regarding the insurance evidence and testimony presented for the first time by Mr. Clem.

In addition, Mr. Clem's counsel advised that an additional issue was collateral estoppel because the arbitrators already decided that there was a discrepancy of approximately $26,000 in what was charged as opposed to services that were actually performed.  The bankruptcy court again disagreed because the arbitrators did not address the issue at hand of whether there was a failure to disclose to the Tomlinsons how the money they paid to Bella Vita was spent on their Project.  Neither of the issues raised by Mr. Clem below pertains to his new appellate arguments under Rules 4007(c) and 15(c).  Accordingly, Appellant's argument that the bankruptcy court erred in allowing the amendment to add time-barred claims is **waived** for failure to raise the issue below. *See Arnone v. County of Dallas Cnty., Tex.*, 29 F.4th 262, 268 n.48 (5th Cir. 2022) (explaining that issues raised for the first time on appeal are waived) (citations omitted).

**b.**       **Appropriateness of Amendment Under Rule 15**

Mr. Clem next contends that the bankruptcy court impermissibly allowed the Tomlinsons to amend their complaint after trial to include fraudulent concealment and fraudulent inducement claims under Rule 15(b)(2), which allows parties to amend their pleadings, after trial, to include issues tried by the parties' express or implied consent but not raised in the original pleading.  Mr. Clem contends that there was neither express nor implied consent by the parties to try these claims as required for amendment under Rule 15(b)(2).  He asserts that there was no express consent because neither party had notice of the so-called new theories of liability. Mr. Clem further asserts that there was also no implied consent because he specifically objected at trial to the introduction of evidence that supports the allegedly new theories. Mr. Clem, therefore, contends that the bankruptcy court erred in allowing the Tomlinsons' post-trial pleading amendment under Rule 15(b)(2).

Rule 15(b)(2) permits  post-trial amendments that conform to the evidence regarding issues tried by express or implied consent.  The Tomlinsons, however, contend that, regardless of  the applicability of Rule 15(b)(2), the amendment was proper under Rule 15(b)(1). The court agrees with Appellees.

Rule 15(b)(1) provides as follows regarding pleading amendments:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

Fed. R. Civ. P. 15(b)(1).

Although the Tomlinsons' written motion to amend their pleadings was not filed and ruled on until approximately two months after the trial (after the bankruptcy court granted their related motion for leave), the Tomlinsons first moved orally to amend their pleadings before conclusion of the trial in light of the bankruptcy court's observations regarding the evolution of the parties' evidence and theories during the trial.   Mr. Clem concedes that he objected at trial to the introduction of evidence that supports the allegedly new theories. The bankruptcy court, in addressing this specific issue, also concluded that Mr. Clem failed to demonstrate that he was prejudiced by the introduction of such evidence, and that permitting the amendment would aid in the overall presentation of the merits in the adversary proceeding.  R. 50-51. Additionally, the bankruptcy court reopened the evidence and held another hearing after allowing the amendment.[11] Thus, the requirements for amendment under Rule 15(b)(1) were satisfied.

Moreover, in not addressing the alternative basis under Rule 15(b)(1) for the bankruptcy's ruling, Appellant **waived** the issue.  *See Lopez v. Sentrillon Corp.*, 749 F.3d 347, 352 & nn.18-19 (5th Cir. 2014), *as revised* (Apr. 28, 2014) (concluding that failure of the appellant to challenge the district court's alternative and independent basis for remand or dismissal constituted a waiver of this issue that defeated any chance the appellant had of prevailing) (citing *Atwood v. Union Carbide Corp.*, 847 F.2d 278, 280 (5th Cir.1988) ("Since appellants have adopted the Bush brief, we examine it to determine the issues presented here. That examination reveals no mention of the causation issue. Because that issue constituted an independent ground for dismissal below, appellants were required to raise it to have any chance of prevailing in this appeal.").

---

[11] In another point of error, Appellant contends that the bankruptcy court erred, after reopening the evidence, in limiting or refusing to hear some of his evidence. This contention is addressed separately below.  *See infra* § 6.

### 2.      Collateral Estoppel

In his fourth appellate argument, Appellant contends that the post-contractual fraud by nondisclosure theories alleged in the Second Amended Complaint are based on the same evidence that the Tomlinsons relied on in the arbitration to support their fraud claims that were denied by the arbitrators.  Specifically, he asserts that, in the arbitration, the Tomlinsons alleged that he and Bella Vita violated the DTPA as a result of making and engaging in the following conduct and representations:

- Failing to follow the engineered foundation design plan in construction of the foundation;

- Failing to notify [the Tomlinsons'] as required in the Contract of a proposed change in the piers to be used in the foundation from concrete piers to helical piers;

- Improper installation of helical piers for the construction of the foundation without [the Tomlinsons'] prior knowledge or approval;

- Failing to properly install concrete piers for the construction of the foundation;

- Failing to build a proper foundation for the Residence in issue;

- Causing damage to [the Tomlinsons'] lots, including but not limited to, water main break;

- Failing to perform construction pursuant to the Contract[];

- Failing to locate and remove city water main under the house site;

- Failing to discuss change . . . from drilled shaft concrete piers to helical piers; and

- Failing to provide fiduciary management of construction funds.

Appellant's Br. 28 (citing R. 209-15, 222-25).  Appellant further asserts that, in describing their fraud claims in the arbitration, the Tomlinsons included the elements for common law fraud, fraud

by nondisclosure, and statutory fraud.  Appellant, therefore, argues that the Tomlinsons' claims in the adversary proceeding based on post-contractual fraud by nondisclosure theories are barred by collateral estoppel and cannot support the judgment against him.[12]  Appellant's Br. 28-30.

The doctrine of collateral estoppel applies to bankruptcy nondischargeability proceedings. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Pancake*, 106 F.3d 1242, 1244 (5th Cir. 1997). "[P]arties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability [and] collateral estoppel can provide an alternate basis to satisfy the elements of § 523(a)(6)." *In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005) (quotation marks and alterations omitted). Thus, "when an issue that forms the basis for the creditor's theory of non-dischargeability has been actually litigated in a prior proceeding, neither the creditor nor the debtor may relitigate those grounds." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1294 (5th Cir. 1995), *abrogated on other grounds by In re Ritz*, 578 U.S. 356 (2016)).

The bankruptcy court, nevertheless, retains exclusive jurisdiction to determine whether a debt is dischargeable. *Grogan*, 498 U.S. at 285 n.11; *In re Shuler*, 722 F.2d 1253, 1255 (5th Cir. 1984). As explained by the Fifth Circuit in *In re Schwager*, application of collateral estoppel in dischargeability proceedings is limited: "Because Congress granted bankruptcy courts exclusive jurisdiction to determine whether a debt is dischargeable based on the bankruptcy courts' expertise, . . . in only limited circumstances may bankruptcy courts defer to the doctrine of collateral estoppel and thereby ignore Congress' mandate to provide plenary review of dischargeability issues." 121 F.3d 177, 181 (5th Cir. 1997) (citations omitted).  Further, in this circuit, collateral estoppel or

---

[12] In addition, Appellant contends that the Tomlinsons' pre-contractual fraud by nondisclosure claims fail for the same reason.  As Appellant acknowledges, however, this was not a basis for the bankruptcy court ruling in favor of the Tomlinsons.  Thus, the court need not address this issue.

issue preclusion does not prevent a bankruptcy court from determining dischargeability issues for itself unless "the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question . . . and the facts supporting the court's findings are discernible from that court's record." *In re King*, 103 F.3d 17, 19 (5th Cir. 1997) (quoting *In re Dennis*, 25 F.3d 274, 278 (5th Cir. 1994)).

When giving preclusive effect to a state court judgment, courts apply the issue preclusion rules of that state. *See In re Miller*, 156 F.3d 598, 601 (5th Cir. 1998) (citations omitted). In Texas, an arbitration award has the same effect as the judgment of a court of last resort for purposes of collateral estoppel. *Casa Del Mar Ass'n, Inc. v. Gossen Livingston Assocs., Inc.*, 434 S.W.3d 211, 219 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Under Texas law, collateral estoppel or issue preclusion in Texas "bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action" and requires the party seeking to invoke the doctrine to establish that: "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *In re Miller*, 156 F.3d at 601 (citations and internal quotation marks omitted).

Mr. Clem contends that these requirements were met because:

the findings of the AAA establish that [the] Tomlinson[s'] presented evidence on the AAA Fraud Claims which match the new fraud theories of liability found . . . by the bankruptcy court: (1) whether [Bella Vita] concealed the substitution of pier system and did not obtain advance approval, (2) whether the water line break was concealed, (3) how [the Tomlinsons'] initial deposit was used, and (4) whether a builder's risk policy was purchased.

Appellant's Br. 29.  In addition, he points to the third, fourth, sixth, fourteenth, and fifteenth findings of fact found by the arbitrators in the Arbitration Award.  *Id.* (citing R. 522-24).  Mr. Clem asserts that, based on these findings regarding the pier substitution, the amounts overpaid by the Tomlinsons, and his representation regarding the builder's risk insurance policy, the arbitrators awarded economic damages to the Tomlinsons for breach of contract and DTPA violations, but denied their claims for "misrepresentation, fraud, fraud in the sale of real estate, conversion, estoppel, alter ego, and joint enterprise" because they "were not sustained by a preponderance of the evidence."  Appellant's Br. 30 (citing R. 525).   Mr. Clem further asserts that the arbitrators' finding that his and Bella Vita's actions did not constitute a "knowing violation" of the DTPA supports his collateral estoppel argument and contention that he did not act with the "moral turpitude or intentional wrong" required by section 523(a)(2)(A).

The bankruptcy court's Findings and Conclusions addressed this issue at length.[13]  For essentially the same reasons stated by the bankruptcy court, the court disagrees that the arbitrators' findings constitute the type of specific findings that are supported by facts discernible from the Award as required for collateral estoppel to apply.  *See In re King*, 103 F.3d at 19 (citation omitted). Additionally, it is not clear if the issues at hand were "actually litigated" in the arbitration.[14]  *See id.* at 601 (citations omitted).  Moreover, the arbitrators' findings—that the Tomlinsons' fraud and DTPA claims were not proved by a preponderance of the evidence; that Bella Vita's and Mr. Clem's conduct did not constitute knowing violations of the DTPA; and that the Tomlinsons were only entitled to economic damages—do "not preclude the bankruptcy court from inquiring into the

---

[13] *See* R. 26-35, 76-78.

[14] *See* R. 78.

true nature of that debt" because it is not bound by the labels used by the arbitrators.  *See id.* at 19-20 & n.3 (explaining that the creditors were not required to recover on a "state-law fraud verdict . . . to prevail on a claim that the debt owed them was obtained by fraudulent behavior and consequently should not be discharged") (citations omitted).  The court, therefore, determines that the bankruptcy court did not err in concluding that collateral estoppel does not bar the Tomlinsons' post-contractual fraud by nondisclosure claims.

### 3.    Personal Liability of Mr. Clem as Applicable to Dischargeability

Mr. Clem's seventh appellate argument pertains to whether he must be personally liable for the debt owed for the Tomlinsons to prevail on their nondischargeability claim.  Appellant first contends that the Tomlinsons' pretrial and post-trial pleadings, and the Joint Pretrial Order are devoid of any alter ego or veil piercing theory to hold him individually liable under Texas law for the obligations of Bella Vita.  Appellant, therefore, argues that Appellees waived any issue as to his personal liability, which is required to deny him a discharge under 11 U.S.C. § 523(a)(2)(A). In addition, Mr. Clem contends that, even if the Tomlinsons did not waive this issue, the evidence fails to provide any basis to pierce the corporate veil or show that he obtained any direct personal benefit from actual fraud as required under *In re Ritz* to make him personally liable for the debts of Bella Vita.  Appellant's Br. 49 & n.25 (citing *In re Ritz*, 832 F.3d at 565) (concluding on remand from the Supreme Court that "Ritz's [individual] liability to Husky under Texas law is a threshold question with respect to whether Ritz may be denied a discharge under § 523(a)(2)(A) because, if Ritz is not liable [as a corporate shareholder for the debt owed by Chrysalis] under Texas law, then he owes no debt to Husky.").

Appellant asserts that the bankruptcy court recognized, as a result of *In re Ritz*, that a debtor must be personally liable under Texas law to be denied discharge, and that personal liability of

managers and members of limited liability companies is precluded under section 21.223 of the Texas Business Organizations Code absent a finding that the debt or obligation was incurred by actual fraud for the direct personal benefit of the manager or member. Appellant further asserts that, in an effort to avoid *In re Ritz* and section 21.223's requirements, the bankruptcy court concluded that a veil piercing analysis was unnecessary based on her *sua sponte* determination that the exception to section 21.223 in section 21.225 of the Texas Business Organizations Code applies because the DTPA qualifies as an "other applicable statute" as contemplated by section 21.225(2).

Based on the following reasoning, Appellant contends that the exception in section 21.225 was misapplied by the bankruptcy court:

> The [bankruptcy] court determined that, because [he] was liable to [the Tomlinsons] by the AAA Award for unspecified DTPA violations, the DTPA "may just be" the other applicable statute to avoid *Husky* and the requirement that [the Tomlinsons] prove that [he] obtained a direct personal benefit from any fraud obligation established. But there is the flaw in the [bankruptcy] court's application. Section 21.225 would provide a basis for [the Tomlinsons] to avoid the requirements of Section 21.223 for a DTPA obligation. However, with the requirements of § 523(a) for a fraud obligation, which is necessary to avoid dischargeability, there is no statutory fraud basis to provide liability under "another statute." Simply the "obligation" at issue must be based on fraud, not DTPA violations, to be non-dischargeable. And both § 523(a)(2)(A) and Texas law require that [he] derive a direct personal benefit for the fraud obligation to be non-dischargeable, which [the Tomlinsons] failed to plead or prove.

Appellant's Br. 51-52.

### a.    Waiver

Appellees do not address Mr. Clem's contention that their pleadings and the Joint Pretrial Order are devoid of any alter ego or veil piercing allegations to hold him individually liable under Texas law for the obligations of Bella Vita. Regardless, the court determines that this argument

was **waived** by Mr. Clem. The issue of whether the Tomlinsons *proved* that a debt or obligation was incurred through actual fraud for the direct personal benefit of Mr. Clem as required for veil piercing under Texas law was raised by him a number of times in the bankruptcy court. The court, however, was unable to find any reference by Mr. Clem in any filing or proceeding in the bankruptcy court regarding the Tomlinsons' *failure to plead or assert in the Joint Pretrial Order* that he is individually liability for the debt or obligation owed to them under an alter ego or veil piercing theory. Arguments not presented to the bankruptcy court and made for the first time on appeal in the district court are deemed **waived**. *Arnone*, 29 F.4th at 268 n.48 (citations omitted). Accordingly, the court need not address Mr. Clem's contention regarding the adequacy of the Tomlinsons' pleadings or the Joint Pretrial Order as to his individually liability under an alter ego or veil piercing theory.

Mr. Clem also suggests that he was prejudiced as a result of the bankruptcy court's *sua sponte* decision to apply section 21.225 of the Texas Business Organizations Code. Again, however, this issue was not raised in the bankruptcy court. Although Mr. Clem filed a motion to reconsider after the bankruptcy court issued its Findings and Conclusions that includes the decision to apply section 21.225, he did not contend that the bankruptcy court erred in not providing him with an opportunity to address this issue beforehand, or that he was prejudiced as a result. Thus, any such argument by him on appeal is similarly **waived**.

As indicated, Mr. Clem further asserts that the bankruptcy court "missapplie[d]"[15] section 21.225 in determining that the debt at issue was nondischargeable. From this, it appears that Mr. Clem contends that section 21.225 is inapplicable to the facts of this case, and that the bankruptcy

---

[15] Appellant's Br. 51.

court erred in applying it rather than section 21.223; however, this issue was not raised below, and he does not explain why he believes that the bankruptcy court "missapplie[d]"[16] section 21.225 or point to any legal authority to support this assertion.  Consequently, this argument is **waived** as well.  *See In re Walker Cnty. Hosp. Corp.*, 3 F.4th at 236 & n.6; *see also supra* n.1 (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 796).

The court's remaining analysis, therefore, focuses on Appellant's contentions that: (1) application of section 21.225 did not relieve the Tomlinsons of proving that he obtained a direct personal benefit from a debt or obligation incurred by fraud as required by *Husky* and § 523(a)(2)(A); and (2) "the 'obligation' at issue must be based on fraud, not DTPA violations, to be non[]dischargeable." Appellant's Br. 51-52.

**b.**     **Dischargeability Under Section 523(a)(2)(A)**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To have a debt excepted from discharge under section 523(a)(2)(A), a creditor must prove that: (1) the debtor made a representation or engaged in other fraudulent conduct; (2) at the time the representation was made, the debtor knew it was false; (3) the debtor made the representation with the intention to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representation. *Saenz v. Gomez*, 899 F.3d 384, 394 (5th Cir. 2018). Thus, contrary to Appellant's assertion, section 523(a)(2)(A) does not require the Tomlinsons to prove that he obtained a direct personal benefit from a debt or obligation incurred

---

[16] *Id.*

by fraud, particularly in light of the bankruptcy court's determination regarding the applicability of the exception in section 21.225 of the Texas Business Organizations Code *to which Appellant did not object below*.

Moreover, a large portion of the bankruptcy court's Findings and Conclusions was devoted to whether the evidence satisfied section 523(a)(2)(A)'s fraud requirement for nondischargeability, and the bankruptcy court's determination in this regard did not turn on the DTPA violations found by the arbitrators.  To the extent that Appellant takes issue with the factual and legal sufficiency of the evidence to satisfy the above referenced requirements for nondischargeability under section 523(a)(2)(A), the court addresses those contentions in the next section that deals with his fifth and sixth grounds for appeal.

### 4.        Legal and Factual Sufficiency of Evidence (Fraud by Nondisclosure)

Mr. Clem's fifth and sixth appellate arguments deal with the sufficiency of the evidence of fraud by nondisclosure.  Appellant contends that the evidence is legally and factually insufficient to support fraud by nondisclosure under Texas law because: (1) the bankruptcy court did not make any findings as to his individual duty to disclose; (2) "[t]here can be no fraud by non[]disclosure regarding the use of the initial deposit when the Contract contained conflicting provisions related to use of the funds"; (3) "[t]here can be no fraud by non[]disclosure when [Bella Vita] disclosed the use of [the Tomlinsons'] initial deposit, which [the Tomlinsons] acknowledged"; (4) "[w]ith a fixed fee Contract, and draw requirements, any alleged fraudulent concealment could not [have] proximately cause any damages"; and (5) "[t]he Contract allowed the substitution of the pier system, thus the substitution could not be actionable fraud by non[]disclosure."  Appellant's Br. 36-42.

Under Texas law, fraud occurs when:

(1) the defendant misrepresented a material fact; (2) the defendant knew the material representation was false or made it recklessly without any knowledge of its truth; (3) the defendant made the false material representation with the intent that it should be acted upon by the plaintiff; and (4) the plaintiff justifiably relied on the representation and thereby suffered injury.

*United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.,* 414 F.3d 558, 566 (5th Cir. 2005) (internal citations omitted). "The first requirement of this test can be met if the defendant concealed or failed to disclose a material fact when a duty to disclose existed." *Id.*

Fraud by nondisclosure is a subcategory of fraud that requires a plaintiff to prove that:

1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non[]disclosure, which resulted in injury.

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019) (citations omitted).

Whether a duty to disclose exists is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citation omitted). As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Id.* (citing *Insurance Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex. 1998)). Thus, silence is equivalent to a false representation "only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford,* 48 S.W.3d at 755; *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App.—El Paso 2010, pet denied) (citation omitted). The duty to disclose arises in the following situations:

(1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth.

*Id.* at 598 (citation omitted).

### a.     Mr. Clem's Duty to Disclose

Appellant first contends that the bankruptcy court "did not specifically make any conclusion of law regarding any duty to disclose with respect to [him] individually."  Appellant's Br. 36.  This characterization by Mr. Clem does not correctly reflect the bankruptcy court's Findings and Conclusions.

The bankruptcy court accurately set forth in detail the law applicable to the duty to disclose under Texas law.[17] The bankruptcy court's analysis focused on the second and third situations in which a duty to disclose under Texas law arises and first applied this law to the evidence and events surrounding the pier substitution. The bankruptcy court concluded that Mr. Clem committed fraud by nondisclosure in light of partial disclosures that gave a false impression and gave rise to a duty of disclosure. The bankruptcy court further concluded that, once new information came to light in early July 2015 that led Bella Vita to believe that it would need to use a different type of foundation pier in building the Tomlinsons' custom home, Mr. Clem had a duty, but failed to disclose this important new information to the Tomlinsons:

> 24. While the Defendant-Debtor has argued that his actions merely amounted to a breach of the Contract by Bella Vita (mainly breach of the requirement to obtain the approval of the Plaintiffs-Creditors of any changes to the Home design), the court concludes that the evidence presented demonstrates something more—specifically a fraud by nondisclosure ***during the performance of the Contract*** that

---

[17] *See* R. 80-82 & nn.206-211.

induced the Tomlinsons to continue on with the Contract longer than they would have, had they known the truth. Specifically, there was a significant gap in time between: (a) when the subsurface water was discovered on the Lots, (b) followed by the unilateral decision to change the pier type, (c) followed by the puncturing of the water line with the unapproved piers, which seriously flooded the Tomlinsons' building pad, and (d) ultimately confirming to the Plaintiffs-Creditors all these events (after the Tomlinsons learned from a neighbor that something seemed amiss). There was no credible testimony offered by the Defendant-Debtor to adequately explain why he chose not to inform the Plaintiffs-Creditors about the discovery of subsurface water; the decision to change piers; and the puncturing of a water line causing massive damages.

25. Applying the specific requirements for a fraud by nondisclosure to the evidence above, the court finds that (1) the Defendant-Debtor concealed or failed to disclose the change in pier type to the Plaintiffs-Creditors (as well as the significant events preceding and following pier installation), which was a material fact within the Defendant-Debtor's knowledge; (2) the Defendant-Debtor knew that the Plaintiffs-Creditors were ignorant of the change in pier type (and surrounding events) and did not have an equal opportunity to discover the change; (3) by failing to disclose the change in pier type (and surrounding events), the Defendant-Debtor intended to induce the Plaintiffs-Creditors to stay in the Contract and continue paying for subsequent draw requests; and (4) the Plaintiffs-Creditors suffered injury as a result of the concealment of the change in pier type, mainly in having to remove and repair the damage from the unapproved helical piers (more on this below).

26. As stated above, fraud by nondisclosure also requires a duty to disclose. Here, the court finds that a duty to disclose arose from the fact that there had been previous representations by the Defendant-Debtor to the Plaintiffs-Creditors that a specific pier type (*i.e.*, concrete piers) would be used in the construction of the Home. Bella Vita proceeded to expend the Tomlinsons' Initial Deposit and requested additional funds from the Plaintiffs-Creditors in order to (among other things) purchase these concrete piers. Once the Defendant-Debtor knew that there was going to be a change to the pier type, the Defendant-Debtor was under a duty to inform the Plaintiffs-Creditors of this change. One needs to consider the overall circumstances. This was not just a simple change in generic building materials. The nondisclosure was a combination of: (a) Bella Vita and its subcontractors encountering subsurface water of which they had reason to be aware; (b) Bella Vita deliberating with engineers and vendors and deciding to make a major change— one that the Tomlinsons ultimately would not feel comfortable with and one which the Bella Vita engineer (Eric Davis) later refused to discuss with them; (c) Bella

Vita changing to helical piers, then puncturing a water line while installing one; and (d) never disclosing any of this until Mrs. Tomlinson started asking questions. As noted above, Texas courts have held "when one makes a representation, new information must be disclosed when the new information makes the earlier representation misleading or untrue." In other words, there is a duty to speak that arises by operation of law. Here, once the Defendant-Debtor knew that there would be a change in the pier type after consulting with the engineer, Eric Davis, the Defendant-Debtor had a duty to disclose the new information to the Plaintiffs-Creditors.

27. To be clear, the court is not finding that there was a fraudulent misrepresentation at the time the Contract was entered into—as to the contractual provisions that the "work would be in compliance with design plans" or as to the provisions that written consent would be obtained for changes. The court is not concluding that the Defendant-Debtor intended not to comply with these Contract representations when they were made. Rather, the court is concluding that the Defendant-Debtor, during the performance of the Contract, intentionally concealed material facts from the Tomlinsons, knowing they were unaware, with the intention of inducing the Tomlinsons to stay in the Contract. The Defendant-Debtor does not refute that he was personally involved (as CEO) in the entire pier switch and water puncturing fiasco. The court believes that the Defendant-Debtor cared **_mightily_** about not losing a $4.5 million contract with a famous NFL star on the biggest home that he had ever contracted to build. This project would be the biggest accomplishment of his young career.

R. 87-90 (footnotes and citations to evidence omitted).  In addition, the bankruptcy court noted that an e-mail Mr. Moss sent to the Tomlinsons on July 20, 2015, noted the installation of "piers" without explaining that "the concrete piers originally required by the Contract's design plans were being changed to helical piers." R. 89 & n.73 (citation omitted).  The court found this amounted to "'a partial disclosure conveying a false impression' . . . of what was really going on with the piers and this may have also triggered a duty to inform the Plaintiffs-Creditors about the change in the pier type." *Id.*

Appellant does not identify any specific reasons why he believes that the Findings and Conclusions with respect to his duty to disclose information regarding the pier switch are factually

and legally insufficient, except to assert that the bankruptcy court "ignored the lack of evidence" of whether he knew that the Tomlinsons had not approved the substitution.  Appellant's Br. 42 (citing R. 2326-27, 2836-38). The court discusses this contention in the next section.

The bankruptcy court similarly applied Texas law regarding a defendant's duty of disclosure to the facts and evidence of accounting disclosures in this case.  The bankruptcy court concluded that partial disclosures of information to the Tomlinsons as to how their Initial Deposit was spent gave rise to a duty to disclose additional information to avoid conveying a false impression, particularly when Mrs. Tomlinson repeatedly sought clarification regarding discrepancies in cost-reconciliations that were provided to her. R. 92-93.  In this regard, the bankruptcy court explained:

> 29.  Second, as to the alleged representation made by the Defendant-Debtor "that the Plaintiffs-Creditors' upfront payment of ten percent (10%) of the total contract price would go only towards the Plaintiffs-Creditors' project," the court concludes that there was an utter failure to disclose how the upfront payment was spent. This was material, and within the Defendant-Debtor's knowledge. The Defendant-Debtor knew the Tomlinsons were unaware of and did not have an opportunity to otherwise discover it. And by failing to disclose, the Defendant-Debtor intended to induce the Tomlinsons to stay in the Contract. This caused harm to the Tomlinsons.

> 30. The Contract clearly stated that draw requests **_with copies of invoices_** (among other documentation) were required—plain and simple. Second, paragraph 6 dealing with the "escrow" of the initial 10% deposit clearly contemplated that Bella Vita would retain it and "apply it against the first approved Draw Request." However, after the Contract was signed, Bella Vita repeatedly failed to fully account for the Initial Deposit, even after repeated requests from Mrs. Tomlinson. Specifically, the court makes note of at least two or three cost-reconciliations that were sent to the Plaintiffs-Creditors, in which there was a failure to fully account for where the Initial Deposit was actually spent (despite previously representing to the Plaintiffs-Creditors in prior draw requests that the entire Initial Deposit had been expended on "soft costs").

> 31. The argument made vociferously by the Defendant-Debtor is that the Contract was a "fixed price" contract—as though nothing he sent or did not send to the

Plaintiffs-Creditors—as far as how their deposit and subsequent draw money was spent—really mattered. However, this defense does not adequately take into account the true nature of the Contract for at least two reasons. First, the Contract did have some mechanisms for cost adjustments—upward or conceivably downward. Second, while no "trust fund" mechanisms/protections were put in place, there were oversight and approval mechanisms that were clearly intended to ensure that the Plaintiffs-Creditors could monitor where their money was being spent and make sure it did not go toward any of the Defendant-Debtor's other projects. This would be a rational concern for any consumer building a house, and Mrs. Tomlinson credibly testified that bad experiences with prior house-building projects were what made her retain a lawyer (Mr. Miller) to negotiate special oversight mechanisms into the Contract. Moreover, the Defendant-Debtor also testified that the Plaintiffs-Creditors "had been burned" by other builders in the past and that he knew the Plaintiffs-Creditors "wanted transparency in the visibility of the cost."

32. The failure to comply with the Contract's requirements to provide invoices and other documentation to the Plaintiffs-Creditors regarding expenditures on their Home project was not only a breach of contract but also, in this court's view, based on the totality of the credible evidence, slipped into the category of a fraudulent nondisclosure. Once again, to be clear, the court is not finding that there was a fraudulent intent at the time of entering into the Contract that Bella Vita would not disclose how the Tomlinsons' Initial Deposit and other funds would be spent. Rather, the court is concluding that, during the performance of the Contract, the Defendant-Debtor personally participated in concealing how the Tomlinsons' funds had been spent with the intention of inducing his famous clients to stay in the lucrative Contract. This court strongly suspects, from the continuous concealment and the Defendant-Debtor's obtuse answers at Trial, that some of the Tomlinsons' funds were used for purposes other than their Home—since no genuine "escrow" was ever actually established.

33. The Plaintiffs-Creditors must show, of course, that there was a duty to disclose in order for this to be an actionable fraud by nondisclosure against the Defendant-Debtor. As noted above, Texas courts have held that there is a duty to disclose "when one makes a partial disclosure and conveys a false impression." Here, such a duty clearly existed in light of the fact that the first two draw requests showed that the Initial Deposit had been completely utilized on "soft costs," creating a false impression that the Initial Deposit had actually been spent on the Plaintiffs-Creditors' home. Yet, in the subsequent reconciliations produced by the Defendant-Debtor, it became clear that the Defendant-Debtor was unable to account for a

significant portion of the Initial Deposit. Thus, the Defendant-Debtor was clearly under a duty to disclose to the Plaintiffs-Creditors how he had or had not spent the Initial Deposit.

R. 87-93 (footnotes and citations to evidence omitted).

Thus, contrary to Mr. Clem's assertion, the bankruptcy court applied Texas law regarding the duty to disclose to the evidence before it and concluded that he had a duty to disclose to the Tomlinsons the pier substitution and how their initial deposit was spent on the Project. The bankruptcy court also determined that nondisclosure of such information constituted the type of fraud necessary to except a debt from discharge under section 523(a)(2)(A) of the Bankruptcy Code. *See* R. 80-97. Accordingly, Appellant's argument that the bankruptcy court failed to make any specific conclusions of law regarding his duty to disclose information to the Tomlinsons with respect to the pier substitution and how their initial deposit was spent on the Project is without merit. To the extent Appellant argues that the bankruptcy court's Findings and Conclusions regarding fraud by nondisclosure are legally or factually insufficient for other reasons, the court addresses these arguments in the next sections, and, for the reasons that follow, it finds no reversible error.

### b.   Fraudulent Concealment of Pier Substitution

### i.   Contractual Provisions Regarding Changes

Based on language in the parties' Contract, Appellant contends that Bella Vita's decision to switch from concrete piers to helical steel piers does not support a finding of fraud by nondisclosure because "[t]he Contract allowed the substitution of the pier system" without the Tomlinsons' prior approval. Appellant's Br. 42. Appellant, therefore, contends that, regardless of whether the Tomlinsons were notified or approved of the pier change, the substitution was

permitted under the parties' Contract without prior notice to the Tomlinsons or their approval after

Bella Vita unexpectedly encountered subsurface ground water:

> Here, without any dispute that the subsurface water encountered when drilling for
> concrete piers prevented the use of the building product set out in the Construction
> Documents, concrete piers, [Bella Vita] had the right to substitute helical piers.
> While the court wrongfully refused to hear evidence from [Bella Vita]'s structural
> expert, Don Illingworth, P.E., that the helical piers qualified as an equal or better
> substitute because of the unavailability of the concrete piers, evidence was provided
> by [Bella Vita]'s Vice-President of Construction, Mike Moss, that the helical piers
> were approved by the Project's engineer, Eric Davis, P.E., and were an equal or
> better substitute pier system. (R. 2264, 2326-2327, 2331-2333, 2825-2826, 2836-
> 2844)[.]

Appellant's Br. 45-46 (footnotes omitted).  For this reason, Appellant takes issue with the

bankruptcy court's twenty third conclusion of law that Bella Vita's "noncompliance with the

Contract, by substituting the pier system in the Construction Documents prior to obtaining

approval from [the Tomlinsons] rose to the level of fraudulent concealment." *Id.* (citing R. 64-

65).

Alternatively, or in addition, Appellant contends that the Contract contains conflicting

language and provisions, and, instead of resolving this conflict by applying principles of contract

interpretation, the bankruptcy court ignored the conflicting contractual language and provisions:

> Regardless of the notification or the approval by [the Tomlinsons], the Contract
> contains conflicting terms with respect to the substitution of building products. In
> Section 9, titled Construction, at subsections C and E, the Contract provides:
>
> > 9.C. Builder agrees to build the Improvements in accordance with
> > first-class, custom home industry standard building practices
> > applicable in the community in which the Project is located, and
> > otherwise substantially in compliance with the Final Plans and the
> > Construction Documents, including, without limitation, the
> > customer selection sheet and customer change orders, if any.
> > However, Owner agrees Builder may substitute materials of similar
> > quality, **but only with the prior written consent of Owner**.

**Memorandum Opinion and Order – Page 44**

9.E. Construction and Finish Out of the Home. Builder does not and can[]not promise or represent that the Home unless identified in writing on the Decorator Selection Sheet or Upgrade/Option/Change Order Addenda, will be identical to any model, representation, or artist sketch. Builder will at all times attempt to ensure that any modifications are equal to or better than represented, and Builder reserved the right to make changes in the plans, specifications, materials, and components being used at the time of purchase, **but only with prior written consent of Owner**. (R. 454)[.]

Then, in the Exhibit "A"—the Draw Schedule and Specifications, just about one inch above the Tomlinson[s'] signatures to acknowledge the Draw Schedule and Specifications, provides:

In our continued efforts to improve our product and **due to the specific unavailability or discontinuance of certain and various building products**, Bella Vita Custom Homes reserves the right to substitute materials of equal or better like and/or kind.

Finally, in Subsection 7.A.5, the Contract provides that "Changes in the work may be necessary to: . . . (3) Correct or cure omissions in the Construction Documents…" specifically mentioning changes necessary for "unusual subsurface soil conditions, topography, or ground water." (R. 453)[.]

Appellant's Br. 42-43 (footnotes omitted) (emphasis added).

Mr. Clem, thus, argues that he had no duty to disclose the pier change beforehand, and any failure to do so does not support the conclusion that he committed fraud by nondisclosure:

Either [Bella Vita] had the right to substitute the helical piers, or at a minimum, the Contract provided notice to [the Tomlinsons] that there were situations in which building products could be substituted without their approval. Either way, the substitution of the piers could not be the basis for any fraud by non-disclosure. *See e.g., In re International Profit Assocs.*, 274 S.W.3d 672, 679 (Tex. 2009) (no duty to disclose clause included in signed contract); *Condent Mobility Servs. v. Falconer*, 135 S.W.3d 349, 355 (Tex. App.—Texarkana 2004, no pet.) (no duty to disclose information within four corners of parties' contract).

Appellant's Br. 46.

**Memorandum Opinion and Order – Page 45**

The sections in the Contract relied on by Mr. Clem do not support his argument that substitution was permitted under the parties' Contract without prior notice to the Tomlinsons; nor do these contractual provisions give rise to an ambiguity that would have relieved him from disclosing the pier change. Sections 9(C) and 9(E) both require the Tomlinsons' prior written consent to substitute materials of similar quality and, thus, require that the Tomlinsons be notified of any such substitutions.

Section 7(A)(5) similarly requires that Bella Vita "promptly notify" the Tomlinsons of all changes of the type identified in that section. R. 453. This section provides that any such changes discovered by Bella Vita must also be administered through a Change Order if the changes will result in additional costs or cause delays to the work. Appellant disputes whether the pier switch resulted in any additional cost to the Tomlinsons, but it is undisputed that the pier change and the circumstances surrounding Bella Vita's decision to switch to helical piers delayed the construction of the Tomlinsons' custom home.

Finally, the language relied on by Appellant in Exhibit "A" to the Contract is irrelevant because the evidence does not support his contention that the change from concrete piers to helical piers was "due to the specific unavailability or discontinuance of certain and various building products." R. 473. Specifically, there is no indication that the change was made because of the unavailability or discontinuance of the type of concrete piers called for in the Contract; rather, the decision by Bella Vita to switch to helical piers was attributable to its belief that helical piers were necessary to address ground water. Thus, Appellant's arguments based on the Contract are without merit and did not obviate the need to disclose the pier change to Tomlinsons beforehand for the reasons stated by the bankruptcy judge.

### ii.        Knowledge of the Pier Change

In addition to his contractual argument, Appellant contends that the bankruptcy court's determination that he fraudulently concealed the pier change does not account for evidence that Mr. Moss "obtained approval, or at least notified [the Tomlinsons] of the change in pier system prior to executing the substitution." *Id.* For support, he cites his own trial testimony and Mr. Moss's testimony during the second phase of the trial. *See id.* (citing R. 2326-27, 2836-38).

Appellant further contends that the bankruptcy court "ignored the lack of evidence" of whether he "knew that [the Tomlinsons] had not approved the substitution." *Id.* at 42 n.18. Relying again on his trial testimony, Appellant asserts that he "testified [that] he was told [that] [the Tomlinsons] approved the helical piers," and that Mr. Moss, who was "overseeing construction" on the Project, similarly "testified that he told [Mr.] Clem that [the Tomlinsons] approved the helical piers." *Id.* (citing R. 2326-27, 2836-38). In a footnote, Mr. Clem further asserts that "[i]t is important to note that [he] was not involved in the construction process[] or the decision to use helical piers, other than he was required to approve the additional costs involved and delegated the responsibility to discuss the issue with the Tomlinson[s] to Mike Moss." *Id.* at 46 n.20.

Mr. Clem's citations to the record do not support his assertion that he delegated the responsibility of discussing the pier change with the Tomlinsons to Mr. Moss. Moreover, the bankruptcy court's determination regarding Mr. Clem's involvement in and knowledge of the pier change issue is supported by his and Mr. Moss's testimony. In addition, the bankruptcy court determined that Mr. Clem's testimony regarding the pier change was not consistent with the documentary evidence or credible in comparison to Mrs. Tomlinson's testimony about this topic.

Mr. Moss's testimony similarly conflicted with the documentary evidence. He also contradicted himself a number of times and admittedly had difficulty precisely recalling the sequence of events.

Mr. Moss testified that he personally spoke with Mr. Tomlinson briefly for two to three minutes the morning of a charity golf tournament, right before the tournament started, about the issues surrounding the need to change from concrete to helical piers.  Because Mr. Tomlinson was happy to hear that progress on the Project was finally being made, Mr. Moss testified that he understood this to mean that the Tomlinsons, or at least Mr. Tomlinson, approved of the pier change *before* Bella Vita installed the helical piers.  R. 2838.  His testimony that the helical piers were not installed until after the Tomlinsons approved of the change, however, was flatly contradicted by the e-mails and bid invoices for helical piers generated before the tournament.

His testimony was also contradicted by Mrs. Tomlinsons' testimony that Jason Witten, the owner of a nearby adjoining property, approached her husband during the charity golf tournament and asked, "[W]hat's going on over at your lot? You guys almost flooded my house a week or so ago." R. 2374.  The Tomlinsons were surprised that this was the first time they were hearing about the flooding and were also concerned that they were hearing it from a neighbor rather than their contractor.  More importantly, Mr. Moss admitted that the flooding mentioned by Mr. Witten occurred as a result of drilling during the installation of the helical piers.  In addition, Mrs. Tomlinson testified that, two days after the golf tournament, she visited the Project site, out of concern, to see for herself what was going on.  By this time the helical piers had been installed. Because she had never seen a helical pier before, she did not recognize what she was seeing on the site that appeared to her to be a bunch of "things sticking out of the ground" that "looked like [skinny] stop sign posts."  R. 2376. In light of this and what Mr. Witten had told her husband, Mrs. Tomlinson texted Mr. Moss and asked him to meet her and explain what was going on.  *Id.*

**Memorandum Opinion and Order – Page 48**

In responding to the text, Mr. Moss agreed that they needed to meet because "we had an issue with the water main and we need to walk you through it and explain what happened."  R. 2375.  It was only at this subsequent meeting that occurred several days after the golf tournament,[18] that the Tomlinsons first learned, *after the helical piers had already been installed*, about the pier change and Bella Vita's reason for changing from concrete to helical piers.  If Mr. Moss truly believed that he had adequately disclosed this issue to the Tomlinsons beforehand and obtained Mr. Tomlinson's approval for the change when he spoke briefly to him at the golf tournament, there would have been no need for a further explanation.

Mr. Tomlinson acknowledged that Mr. Moss had approached him briefly during the charity golf tournament to say hello and let him know the piers were being installed.  He also recalled Mr. Moss mentioning a problem, but he disagreed that Mr. Moss had provided him with any meaningful disclosure about something as significant as a change to the foundation of his home or the need to change from concrete to helical piers.  R. 2917.  He also denied approving any such change.  According to Mr. Tomlinson, there was simply not enough time to have a discussion of that kind because he was getting ready for the golf tournament that he was hosting; he had to talk to the media; and there were countless people approaching him during this time, asking him for photographs and autographs.  R. 2917-18.

In addition, because Mr. Moss regularly talked to his wife about the Project, Mr. Tomlinson assumed that Mr. Moss would update her on any important problems that needed attention.  R. 2917.  Mr. Tomlinsons' testimony in this regard was consistent with Mr. Moss's and Mr. Clem's testimony that Mrs. Tomlinson was the main contact and point person handling the oversight of

---

[18] R. 2880.

the Project, not Mr. Tomlinson.  R. 2881; R. 2239.  This admission by Mr. Moss also undermined

his explanation on cross-examination as to why he chose to speak with Mr. Tomlinson during a

busy charity event, rather than Mrs. Tomlinson, about something as important as changing the

foundation design to use helical piers.  In this regard, Mr. Moss testified that, even though Mrs.

Tomlinson was his main contact for the Tomlinsons, he chose not to talk to her about the pier

change because:

> this is one of those pieces that was not something that at the time that I deemed
> would be something that would be of interest to her because it's part of the
> foundation, it's not the aesthetic portion of the house, which is where her driving
> force was, . . . the aesthetics of the home, not the bricks and sticks.

R. 2882.   Mr. Moss's testimony that Mrs. Tomlinson was mainly concerned regarding the

aesthetics of the construction process rather than the "bricks and sticks" is inconsistent with the

numerous written communications between Mrs. Tomlinson, on one hand, and Mr. Moss and Mr.

Clem, on the other hand, regarding the Project. Her communications did involve some aesthetic

issues, but they also pertained to everything from soil reports, permits, and engineering plans to

accounting issues on a micro rather than a macro level.

This is not surprising given Mrs. Tomlinsons' experience in dealing with contractors in

previously building a custom home.  Mr. Clem recognized as much and, for this reason, knew that

Mrs. Tomlinson was not a typical client in that she was a knowledgeable client with a "hands-on"

approach to overseeing the Project.  Mr. Clem attempted to discredit Mrs. Tomlinson's testimony

by suggesting that she could be "emotional" and sometimes "exaggerated."  R. 2241.  Her written

communications and strong command of the details and documentary evidence regarding the

Project while testifying suggest otherwise.  Her written communications alone suggest that she

possibly knew more than any one person regarding every detail of the Project, except to the extent

**Memorandum Opinion and Order – Page 50**

information was withheld from her, and it is clear that she consistently held Bella Vita's "feet to the fire." It is more likely for this reason that Mr. Moss opted to speak with Mr. Tomlinson, hoping to avoid Mrs. Tomlinson's scrutiny and numerous questions and concerns regarding the pier change, warranties, revised engineering plans and permit approval, potential liability, and Bella Vita's lack of prior experience with helical piers, all of which followed immediately after she learned about the change.

In sum, resolution of this issue turns in large part on the bankruptcy court's assessment of witness credibility in relation to other documentary evidence. The court finds no error in this regard. As the bankruptcy judge here had the opportunity to observe the demeanor of Mr. Clem, Mr. Moss, and the Tomlinsons, she was in a "far superior position to gauge [their] credibility" than the undersigned is as a result of its review of the transcripts of the hearings held in the bankruptcy court. *In re Acosta*, 406 F.3d 367, 373 (5th Cir. 2005) (citations omitted). Additionally, for the reasons explained, the bankruptcy court's credibility assessments are consistent with the documentary evidence.

### c.    Accounting Nondisclosures (Initial Deposit and Draw Requests)

Appellant Clem asserts that the evidence is legally and factually insufficient to support the bankruptcy court's fraud by nondisclosure determination with respect to accounting nondisclosures involving the Tomlinsons' Initial Deposit and Bella Vita's draw requests for the Project. Mr. Clem first asserts that "[t]here can be no fraud by non-disclosure regarding the use of the initial deposit when the Contract contained conflicting provisions related to use of the funds." Appellant's Br. 36. Appellant further asserts:

> Even if [Bella Vita] had not provided an accounting for the costs incurred, and/or [the Tomlinsons] didn't know whether the initial deposit had been exhausted, the Contract was a "fixed fee" contract whereby [the Tomlinsons] was required to pay

for the construction tasks as they were completed. In other words, the question whether the deposit was exhausted had zero bearing on the amount Tomlinson would owe for the construction and any breach of Section 6 of the Contract, or any failure to account for the deposit, could not proximately cause any damages with a fixed fee contract.

*Id.* at 41-42 (quoting R. 452).

Appellees respond, and the court agrees, that the issue of whether the Contract contains conflicting provisions as urged by Mr. Clem is quite beside the point. The court understands that Mr. Clem argued during the second phase of the trial, as he does here, that the evidence and witness testimony support his defense that perceived discrepancies in how the Initial Deposit was spent and whether the draws were appropriate does not support the bankruptcy court's finding of fraudulent intent, but instead, merely establishes his and Bella Vita's compliance with the Contract. The emphasis by the parties regarding the interplay between what Bella Vita was required to disclose under the Contract and what Mr. Clem had a duty to disclose in light of prior representations regarding Project expenditures unnecessarily confuses this issue.

The bankruptcy court rejected Mr. Clem's assertion that Bella Vita had complied with the Contract, but its fraudulent concealment determination did not ultimately turn on whether Bella Vita or Mr. Clem complied with the Contract. *See* R. 90-91. The bankruptcy court determined that prior representations to the Tomlinsons in relation to "draw requests that the entire Initial Deposit had been expended on 'soft costs'" gave rise to a duty to fully account for the Initial Deposit, particularly in light of Mrs. Tomlinson's repeated request for such information. R. 91. The bankruptcy court further determined that there was an absolute failure to fully account for the Initial Deposit. In this regard, the bankruptcy court noted that "at least two or three cost-reconciliations that were sent to the Plaintiffs-Creditors, in which there was a failure to fully account for where the Initial Deposit was actually spent." *Id.*

Moreover, the issue of whether Mr. Clem's intent in not fully disclosing this information was fraudulent as he urged turned primarily on credibility assessments regarding the various witnesses, including Mr. Clem, who testified regarding this matter. The bankruptcy court was not convinced that Mr. Clem's conduct or intentions in this regard were innocent. In reviewing this determination, the court gives "due regard" to the bankruptcy court's firsthand assessment of witness credibility and finds no error. *In re Acosta*, 406 F.3d at 373 (citations omitted).

Mr. Clem next contends that "[t]here can be no fraud by non-disclosure when [Bella Vita] disclosed the use of [the Tomlinsons'] initial deposit, which Tomlinson acknowledged." Appellant's Br. 39. To support his assertion that the Tomlinsons were aware that their Initial Deposit had not been spent, Mr. Clem contends that "[o]n June 4, 2015, [the Tomlinsons] received from [Bella Vita's] accounting department a spreadsheet showing that only $340,738.99 had been incurred by [Bella Vita], which is less than the initial deposit. *Id* at n.15 (citing R. 2082-83). He also points to Mrs. Tomlinson's testimony during the first phase of the trial.

Mr. Clem argues that, because the Tomlinsons knew that Bella Vita had not exhausted the Initial Deposit and Mrs. Tomlinson admitted as much, there was no duty to disclose, and the Tomlinsons' fraudulent concealment claim on this basis fails because:

> The estoppel effect of the fraudulent concealment ends when a party has actual knowledge of the injury-causing conduct, or learns of facts, conditions, or circumstances that would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011); *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983); *see also[ ] Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010); *Coastal Corp. v. Atlantic Richfield Co*., 852 S.W.2d 717, 720-21 (Tex. App. – Corpus Christi 1993, no writ) (because Plaintiff learned of misrepresentation was false prior to entering into contract, any action taken by Plaintiff was with full knowledge and does not constitute fraud); *Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd*., 817 S.W.2d 160, 164 (Tex. App.— Houston [14th Dist.] 1991, no writ) (buyer who used existence of drainage

easement to obtain a price reduction was estopped from making claim of non-disclosure related to the easement preventing development of land).

Appellant's Br. 39 (footnote omitted).

This issue of estoppel was raised in the bankruptcy court before and during the second phase of the trial, as it pertains to the arbitration findings and the claim for DTPA violations, but the court was unable to find anywhere, whether in his motion for reconsideration or during the second phase of the trial that Mr. Clem argued that the Tomlinsons were collaterally estopped from asserting their fraudulent concealment claim based on accounting nondisclosures because they were aware of the issues.  Accordingly, Mr. Clem **waived** this issue by not presenting it to the bankruptcy court.

Moreover, the evidence does not support his assertion that Bella Vita fully disclosed the use of the Tomlinsons' Initial Deposit or that the they had sufficient knowledge of the issue to be barred by estoppel from asserting their claim for fraudulent concealment based on accounting nondisclosures. Instead, Mrs. Tomlinson testified that it was only after Bella Vita began asking for draws that her suspicion was aroused as to whether the full amount of the Initial Deposit had been spent.  It was this concern that prompted her to start requesting Bella Vita, including Mr. Clem, for more information and supporting invoices for costs incurred to date on the Project. She also asked her accountant to review the documentation provided by Bella Vita.  Mrs. Tomlinson testified that, contrary to Mr. Clem's testimony, the money they paid Bella Vita was never fully or accurately accounted for or disclosed to them before the Contract was terminated.  As noted, the bankruptcy court agreed[19] and "strongly suspect[ed] from the continuous concealment and [Mr.

---

[19] As with other issues, Mr. Clem attempts to minimize his involvement or knowledge of what was going on with his own company by asserting on appeal that: (1) "the record is devoid of any involvement by [him] in the preparation of [the] spreadsheets" that were provided to the Tomlinsons; and (2) his "only involvement was forwarding some of the

Clem's] obtuse answers at Trial, that some of the Tomlinsons' funds were used for purposes other than their Home—since no genuine 'escrow' was ever actually established" for the Project.  R. 92.

Finally, Appellant contends that, even if Bella Vita did not provide an accurate accounting for the Project costs incurred, and the Tomlinsons did not know whether the Initial Deposit had been exhausted, their claim for fraudulent concealment still fails because "[w]ith a fixed fee Contract, and draw requirements, any alleged fraudulent concealment could not [have] proximately cause[ed] any damages."  Appellant's Br. 41.  Appellant, therefore, argues that "the question [of] whether the deposit was exhausted had zero bearing on the amount [the Tomlinsons] would owe for the construction and any breach of Section 6 of the Contract, or any failure to account for the deposit, could not proximately cause any damages with a fixed fee contract."  *Id.* at 41-42.

The bankruptcy court rejected Mr. Clem's "fixed-price" contract argument outright, *see* R. 91, and concluded that the Tomlinsons were damaged as a result:

> What would be the resulting actual damages owed to the Plaintiffs-Creditors for this nondisclosure? In looking at the various cost breakdowns that were submitted into evidence at the Trial, as well as the testimony of the Defendant-Debtor, Mrs. Tomlinson, and the Defendant-Debtor's father, the most logical amount this court can derive is $207,000. This represents the amount of the subsequent draw requests ($68,310 plus $138,690) that the Plaintiffs-Creditors paid, based on a belief that their Initial Deposit had all been expended. In fact, there was a failure to disclose

---

reconciliations from [Bella Vita's] accounting department to [the Tomlinsons]."  Appellant's Br. 39.  This, however, is in stark contrast to his testimony at trial that he worked closely with the Tomlinsons and, in particular Mrs. Tomlinson. He also frequently volunteered information regarding various issues, dates, and events. While his testimony was not always responsive to questions posed to him, it was unequivocal and sufficient to support a finding that his involvement in the Project was not as limited as he now contends.  Such contention is also inconsistent with Mr. Moss's testimony that Mr. Clem was involved in monetary decisions, that he reported directly to Mr. Clem, and that, whenever there was an issue on a project, he would discuss the issue with Mr. Clem in their weekly meetings. R. 2823. Accordingly, the bankruptcy court did not err in finding that he "knew [that] the Tomlinsons were unaware of and did not have an opportunity to otherwise discover" how their Initial Deposit was spent or whether it was actually spent on their Project. R. 91. Additionally, the court finds no error in the bankruptcy court's "concluding that, during the performance of the Contract, the Debtor-Defendant personally participated in concealing how the Tomlinsons' funds had been spent with the intention of inducing his famous clients to stay in the lucrative Contract."

> how as much as $215,418 of the Initial Deposit was even spent. To this day, the Defendant-Debtor has failed to disclose how these funds were or were not spent. The mystery looms. Accordingly, the court believes that $207,000 represents the damages Plaintiffs-Creditors are entitled to against the Defendant-Debtor for failing to fully account for how the Initial Deposit was spent.

R. 93. Additionally, as previously noted, the bankruptcy court was not persuaded that any of Mr. Clem's evidence during the second phase of the trial established otherwise.

For the reasons stated by the bankruptcy court, Mr. Clem's "fixed price" contract argument oversimplifies and mischaracterizes the Contract, which included some oversight provisions at Mrs. Tomlinsons' request because she "had been burned" in the past by other builders" and "wanted transparency" with the costs for this Project to ensure that the money paid she and her husband paid Bella Vita was actually spent on the construction of their home and not another Bella Vita project. *See* R. 91-92. Moreover, that the Contract was a "fixed price" contract is distinct from and not dispositive of whether Appellees suffered any damages resulting from the fraudulent accounting nondisclosures.

### 5.    Imposition of Sanctions

Mr. Clem's seventh appellate argument pertains to the sanctions against him that were ordered by the bankruptcy court.  He contends that the bankruptcy court wrongfully found that he fraudulently concealed whether Bella Vita had insurance policies in effect during the Tomlinsons' Project.  Mr. Clem further asserts that the bankruptcy court's Findings and Conclusions do not provide any basis for the imposition of sanctions.  According to Mr. Clem, the bankruptcy court's "assessment of the facts reminds of a Bizarro world," and, from a legal standpoint, sanctions are not appropriate under Federal Rule of Civil Procedure 11 or the bankruptcy court's inherent power. Appellant's Br. 57.  Finally, Mr. Clem argues that, although Appellees did not move for sanctions, the bankruptcy court *sua sponte* sanctioned him without first providing him with notice in the form

of a show cause order, a hearing, or an opportunity to respond before sanctions were imposed.  Mr. Clem, therefore, contends that the bankruptcy court abused its discretion in awarding $19,384.26 in attorney's fees against him as a sanction, and the sanction violated his right to due process.

The imposition of sanctions by the bankruptcy court is a matter of discretion that is reviewed under an abuse of discretion standard. *In re Sadkin*, 36 F.3d 473, 474 (5th Cir. 1994) (citations omitted).  Bankruptcy courts have inherent authority under 11 U.S.C. § 105(a) to issue civil contempt sanction orders to "'compensate another party for the contemnor's violation' of a court order." *In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 294 (5th Cir. 2022) (citation and footnote omitted). "In relevant part, Section 105(a) provides that bankruptcy courts may "*sua sponte*, tak[e] any action . . . necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *Id.* at n.14.

Here, the bankruptcy court did not specify the legal basis for imposing sanctions against Mr. Clem, but it explained in detail the factual basis for its conclusion that a sanction in the form of attorney's fees incurred by the Tomlinsons was warranted —"irrespective of the ultimate section 523 nondischargeable debt"—as a result of Mr. Clem's "prolonged nondisclosure of insurance" in relation to his:

> failure to comply with Rule 26(a), failure to comply with the Alternative Scheduling Order, and failure to comply with the Joint Discovery Plan. Again, the court considers the Defendant-Debtor responsible for these nondisclosures—particularly when one considers that there was a failure to produce insurance even prepetition when Defendant-Debtor was represented by other attorneys.

*See* R. 36-49.  The bankruptcy court did not find the various excuses for Mr. Clem's post-petition failure to timely disclose information regarding Bella Vita's insurance in the two years of litigation before commencement of the trial in the adversary proceeding to be credible or convincing. *See* R. 40-41, 43-44.  In this regard, the bankruptcy court explained:

**Memorandum Opinion and Order – Page 57**

[T]he court expressed that the Defendant-Debtor and his counsel could not skirt the issue by simply blaming the prepetition nondisclosure of insurance on the Defendant-Debtor's prior counsel—because the nondisclosure had persisted postpetition.

. . .

On October 11, 2017, the Defendant-Debtor continued with his theme of plausible deniability on the subject of the nondisclosure of the insurance. While his deniability at times seemed potentially plausible, the court was not convinced that the Defendant-Debtor was being wholly candid on the subject.

. . .

On balance, the court does not accept as credible the Defendant-Debtor's position that he really was never aware that the Tomlinsons wanted to know about insurance or that insurance had any significance in this whole litigation. For one thing, the Defendant-Debtor's reactions on the subject changed slightly from the first day of Trial to the second day of Trial. On the first day of Trial, the Defendant-Debtor stated that the subject of insurance came up at a prepetition deposition and that the Tomlinsons' counsel was given copies of the insurance then (which was not corroborated and, in fact, was credibly denied by the Tomlinsons' counsel). Then on the second day of Trial, the Defendant-Debtor was quietly adamant that he never knew that the Tomlinsons' were inquiring about insurance and it never occurred to him that it was in any way relevant to their lawsuit. The court cannot believe that lawyers at Bell Nunnally completed and submitted answers to the Requests for Admission with no input or awareness from the Defendant-Debtor. The court cannot believe that the Defendant-Debtor never realized until a day or so before the first day of Trial in this Adversary Proceeding that the Tomlinsons had complained that the Defendant-Debtor and Bella Vita had fraudulently misrepresented that there would be insurance for their Home project—including general liability that covered contractual liability and an umbrella policy.

*Id.*

The bankruptcy court, instead, found that Mr. Clem's "prolonged nondisclosure of insurance" and "surprise defense at Trial that Bella Vita ***did***, in fact, have general liability and umbrella liability insurance policies" was yet another "example of a pattern of concealment engaged in by [him] vis-a-vis the Tomlinsons." *Id.* at 43, 47-48. The bankruptcy court further determined that, while it could only speculate regarding Clem's true motive for not disclosing the

information regarding insurance before trial, the totality of the evidence revealed a pattern of concealment, and that Mr. Clem remained silent about the issue of insurance "when it was convenient and advantageous for him to do so." *Id.* at 47.

Moreover, because the sanction was attributable at least in part to Mr. Clem's failure to comply with a bankruptcy court order, the imposition of sanctions against him in the form of attorney's fees fell within the bankruptcy court's inherent authority under § 105(a), which as noted does not require prior notice. The bankruptcy court's decision to impose sanctions also turned in large part on Mr. Clem's credibility, or lack thereof, and this determination is supported by the record. Accordingly, the bankruptcy court did not abuse its discretion in sanctioning Mr. Clem, and the court sees no reason to second guess the bankruptcy court's witness credibility assessment.

### 6. Exclusion of Evidence in Phase II of the Trial

In his eighth and final appellate argument, Mr. Clem contends that the bankruptcy court erred in not allowing him to put on certain evidence in the second phase of the trial, and that the exclusion of such evidence was not harmless. Appellant asserts that, while the bankruptcy court's Order Setting Phase II of the Trial (R. 2220) allowed him to present some evidence, it "did not allow [him] to present evidence on all issues related to the new theories of recovery, the sanctions awarded, or the damages awarded." Appellant's Br. 59. Appellant contends that the following evidence was excluded on relevance grounds "despite its crucial nature to [his] defense [to] the new theories of liability, the sanctions, and the damages awarded":

- Clem's Supplemental Pre-Trial Order (R v8 at 1953 [ECF Doc. 98]) that updated Clem's defenses and arguments following the court allowing [the] Tomlinson[s] to file the Post-Judgment Complaint;

- The Declaration of George Bubba Sykes (R 1963 [ECF Doc. 99]) that explained why the builder's risk policy had not issued as there was no structure

yet to insure at the time of Contract termination which was relevant to show that policy was incurred as a cost, but would not issue or actually be paid until the project went "vertical";

- Exhibit 26—Don Illingworth's Curriculum Vitae and Report on Helical Piers providing proof that Helical Piers are an equal, if not better, alternative to concrete piers, which was the reason for [Bella Vita]'s substitution of the foundation design, and proof of why the previous foundation design was unavailable which was relevant to show that the substitution was permitted by Sections 7.5.A and the Draw Schedule of the Contract (R 2208-2214 and 1966 [ECF Doc. 100]));

- Testimony of Jim Jenkins, CPA, [Mr.] Clem's accounting expert regarding accrual of the cost of the builder's risk policy and [Bella Vita]'s accounting procedures for requesting draw procedures which is relevant to show [Bella Vita] had the right to seek payment of the draw requests without exhausting the initial deposit. (R. 2948-2952);

- Exhibit 30—Cost Detail of [Bella Vita]'s work on September 24th providing evidence of all funds spent, and crediting back amount of builder[']s risk policies which was relevant to show that [Bella Vita] did not conceal any accounting for the Project; (R. 2964);

- Exhibit 16—Transcript of the 341 Meetings from [Bella Vita]'s bankruptcy on January 8, 2017 and April 28, 2017 providing proof of [Bella Vita]'s commercial general liability and umbrella insurance policies, where [the] Tomlinson[s] w[ere] present at those 341 meetings which was relevant to impeach [their] claim that the liability policies were concealed (R. 2197-2199);

- Testimony of Van Shaw regarding Exhibit 35 to show that [Bella Vita] provided all requested accounting documents, with back-up invoices for the project within six weeks of Contract termination which was relevant to show a lack of any concealment of funds and amounts spent on the Project (R. 2977-2980, 2091-2191);

- Exhibit 37—survey showing the [Bella Vita]'s original plans for the placement of [the Tomlinsons'] home on the lot compared with the new position by the subsequent builder showing that, because the house was moved back on the lot by approximately forty (40) feet, all the costs for the pier system (removal

and replacement) as well as the lot and site preparation work had to be incurred, not because of [the Tomlinsons'] complaint with the type of pier, but so that they could move the placement of the house on the lot (R. 2217-2219 [ECF Doc. 103]); and

- Exhibit 38—Plans for [the Tomlinsons'] home designed by Scott Simmons showing the new placement of [the Tomlinsons'] home on the lot approximately forty (40) feet back from its original location where the piers were installed by [Bella Vita], which is relevant to show the damages alleged incurred by Tomlinson because of the pier substitution were going to be incurred regardless. (R. 2864-2868).

Appellant's Br. 60-61. He asserts that the exclusion all of the foregoing evidence "violated [his] right to defend" because it was "directly relevant" for the reasons described above to an issue in the bankruptcy court's findings and conclusions and provided "highly probative exculpatory evidence as to the fraud by non-disclosure of the piers or accounting, the failure to purchase the builder's risk policy, or the sanctions, or providing evidence th[at] negates the damages awarded." *Id.* at 62-63.

Appellees respond that "[n]one of the excluded evidence was relevant to the two issues" for which the evidence was reopened, or it was properly excluded for other reasons, and "much of the evidence was of no consequence in determining the case," such that its exclusion could not have prejudiced Appellant. Appellee's Resp. 40-41.

Without expounding on Appellee's contentions regarding each piece of evidence identified in his Appellant's brief, Mr. Clem replies in one paragraph that the exclusion of evidence in the second phase of the trial "was not simply an 'evidentiary ruling' as described by Appellees." Appellant's Reply 25. Appellant argues that the exclusion of evidence was, instead, a denial of due process as a result of the bankruptcy court's limiting the Phase II trial topics and refusing to

allow him to introduce exculpatory evidence (as defined on page 61 of his appellate brief) that he argues was necessary to his defense.  *Id.*

A trial court's evidentiary rulings are reviewed "under the deferential abuse-of-discretion standard." *Williams v. Dixie Specialty*, 85 F.3d 620 (5th Cir. 1996) (citation omitted); *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 356 (5th Cir. 1995) (citation omitted).  Contrary to Appellant's conclusory assertion, the bankruptcy court's rulings in excluding certain evidence offered by him during the second phase of the trial were evidentiary rulings.  Further, as Appellees correctly note, an appellate court cannot reverse a trial court's evidentiary rulings unless they are erroneous and result in substantial prejudice," and "[t]he burden of proving substantial prejudice lies with the party asserting error."  Appellees' Resp. 39 (citing and quoting *FDIC v. Mijalis*, 15 F.3d 1314, 1318-19 (5th Cir. 1994) (citing *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990)).

The court has carefully considered Appellant's arguments and, for the reasons that follow, concludes that the bankruptcy court did not abuse its discretion in excluding the evidence at issue, or, *even assuming* that any of the evidentiary rulings were erroneous, reversal is not warranted because Appellant has not shown that his substantial rights were adversely affected as a result. *See Crumpton v. Confederation Life Ins. Co.*, 672 F.2d 1248, 1253 (5th Cir. 1982) ("Absent a showing that substantial rights of the party were adversely affected, reversal for an erroneous ruling on evidence is not warranted.") (citations omitted); *Greener v. Cadle Co.*, 298 B.R. 82, 91 (N.D. Tex. 2003) (affirming bankruptcy court's admission of evidence because "Greener has not demonstrated that his substantial rights were affected by the admission of the Partnership Agreement or the Contribution Agreement.").

### a.       Defense Exhibit 16

Defense Exhibit 16 is an excerpt from the transcript of the January 8, 2017 creditors'
meeting in the Bella Vita bankruptcy case and an attendance sheet for the meeting.  In not admitting
defense Exhibit 16, the bankruptcy court sustained the Tomlinsons' objection that it was outside
the scope of the two limited issues for which the evidence was reopened.  The bankruptcy court
did not rule on the Tomlinsons' objection that the record was not certified.  As indicated, Appellant
contends that bankruptcy court erred in not admitting Exhibit 16 because it was "relevant to
impeach [the Tomlinsons'] claim that the [insurance] liability policies were concealed" in that it
shows that information regarding Bella Vita's insurance coverage was disclosed during a January
8, 2017 creditors' meeting that the Tomlinsons and other creditors attended.  Appellant's Br. 60.
He similarly argued in response to the Tomlinsons' objection that it was relevant to the bankruptcy
court's Findings and Conclusions: "[Y]ou essentially based [your Findings and Conclusions] on
three new theories, one of which was this concealment of the insurance policies."  R. 2786.  The
bankruptcy court disagreed.  Regarding prejudice, Appellant asserts that this "evidence regarding
[the Tomlinsons'] knowledge of the liability policies would negate the sanctions award."  *Id*. at
64.

This argument by Appellant conflates and misstates the bases for two different things: (1)
the bankruptcy court's sanction against him for failing to disclose information regarding insurance
as required by Rule 26(a), the Alternative Scheduling Order, and the parties' Joint Discovery Plan;
and (2) the Tomlinsons' claim that Mr. Clem "personally supervised reports going out to the
Tomlinsons . . . created the false impression that $22,415.93 of [their] money had been used to
acquire a Builder's Risk Policy."  R. 94-95.  In its Findings and Conclusions, the bankruptcy court
noted regarding the fraud by concealment claim by the Tomlinsons that, while Mr. Clem testified

and explained that a builder's risk insurance was never purchased, there was documentary evidence that showed he falsely represented to the Tomlinsons "on multiple occasions that Bella Vita had, in fact, purchased the builder's risk insurance policy and paid for the . . . policy." *Id.* Appellant's Exhibit 16 and contention that he did not conceal the existence of insurance is not relevant to this issue or the sanctions award and does not rebut the bases for the bankruptcy court's sanctions or damages award with respect to these issues.  Thus, the exclusion of this evidence was not erroneous and could not have adversely affected a substantial right of Mr. Clem.  Moreover, if Mr. Clem believed that this evidence was key to his defense to the Tomlinsons' claim regarding insurance related misrepresentations, he could have offered it on the first day of trial on August 23, 2017, before the evidence was reopened, as this was when he raised his surprise insurance defense for the first time.

### b.      Defense Exhibit 26

Regarding Exhibit 26—Don Illingworth's Curriculum Vitae and Report on Helical Piers— Appellant argues that the bankruptcy court erred in not admitting this evidence because it shows that the helical piers were an equal, if not better, alternative to concrete piers, which he asserts was the reason for Bella Vita's decision to substitute the helical for concrete piers.  In addition, he argues that this evidence proves "why the previous foundation design was unavailable" for purposes of section 7.5.A of the Contract and the Draw Schedule.  Appellant's Br. 60.

When asked during the second phase of the trial why the Contract language was relevant to the Tomlinsons' fraudulent nondisclosure claim, Appellant's counsel responded that evidence that Bella Vita complied with the Contract specifications and used a better, more expensive product rebutted any suggestion of fraudulent intent. The bankruptcy court disagreed, sustained the Tomlinsons' objection, and did not allow Mr. Clem to put Mr. Illingworth on as a witness.  The

bankruptcy court also denied the defense's request for an extension to submit a sworn written proffer of Mr. Illingworth's testimony after the deadline set in an order that was entered six weeks earlier.  R. 2913.  The bankruptcy court excluded defense Exhibit 26 for similar reasons and because Mr. Illingworth's report was not a sworn written proffer of his testimony as required by its order.

Mr. Clem's appeal is limited to the exclusion of Exhibit 26.  He contends that he was prejudiced by the exclusion of this evidence because it would have negated the Tomlinsons' fraudulent concealment claim based on the pier substitution by establishing Bella Vita's compliance with the Contract in substituting the helical piers for the concrete piers called for in the Contract.

The court previously addressed and rejected Mr. Clem's contention about the helical pier substitution being authorized by section 7.5.A of the Contract due to unavailability. Contrary to his assertion, this section authorized the substitution of "equal or better like and/or kind" building materials due to the "**unavailability or discontinuance of certain and various *building products***," not because of the unavailability of the original "design" for the Tomlinsons' residence or foundation that was agreed to by the parties.  Moreover, as explained, neither this section nor the other sections of the Contract relieved Mr. Clem from disclosing the pier change beforehand to the Tomlinsons.  Accordingly, the exclusion of this evidence in the second phase of the trial was not  erroneous, and Appellant has not met his burden of showing that its exclusion adversely affected any substantive right.

### c.        Defense Exhibits 37 & 38

Appellant contends that the bankruptcy court erred in not admitting defense Exhibits 37 and 38 because the survey (Exhibit 37) and the plan of the Tomlinsons' home designed by Scott

Simmons (Exhibit 38) show the plans for the placement of the Tomlinsons' home that was on the lot changed, and, as a result, the house was moved back on the lot by approximately forty feet. He, therefore, argues that this evidence "establishes [that] the real reason for the $435,000 in damages related to the pier system and lot preparation" was due to the Tomlinsons' decision to move the location of their house after the helical piers were installed by Bella Vita, not because Bella Vita decided to switch to and install helical piers in the original location.  Appellant contends that this is "relevant to show [that] the damages alleged incurred by [the] Tomlinson[s] because of the pier substitution were going to be incurred regardless."  Appellant's Br. 61.

Exhibit 37 (R. 2217-2219) appears to be identical to defense Exhibit 18 (R. 2005-2007). According to bankruptcy docket sheet entry number 103, defense Exhibit 18 was admitted and discussed during the second phase of the trial.  *See* R. 2856-60.  Thus, Mr. Clem has not shown that the exclusion of this exhibit adversely affected any substantive right.

According to Mr. Clem's citation to the record (R. 2864-2868), Exhibit 38 was excluded because it was offered for the first time during the second phase of the trial on April 17, 2018, and was not included in his exhibit list. Mr. Clem's attorney first argued that that the exhibit should be admitted because, like Exhibit 18, it was relevant to the credibility of Ms. Tomlinson regarding the movement of the house.  When pressed about why Exhibit 38 was not previously disclosed, defense counsel argued it was not disclosed because he had originally planned to use it to impeach Ms. Tomlinsons' testimony, but he ultimately did not use it for this purpose because she did not testify the way he anticipated. Counsel also explained that he only recently learned in the last couple of days that the location of the Tomlinsons' house had moved and come to realize that the move was "significant."  R. 2867.  The bankruptcy court ultimately sustained the Tomlinsons' objection to Exhibit 38, reasoning that counsel's excuse for not previously disclosing this exhibit

sounded similar to his prior explanation for not disclosing the existence of Bella Vita's insurance until the first day of the first phase of the trial: "Do you know what . . . this reminds me of, when you just got the insurance policy a day or two before the last hearing."  R. 2868.

The court finds no error in the bankruptcy court's exclusion of this evidence as a result of Mr. Clem's failure to disclose it beforehand by including it in his exhibit list.  Further, as with Exhibit 37, Mr. Clem has not shown that the exclusion of Exhibit 38 adversely affected any substantive right because the bankruptcy court allowed a fair amount of testimony regarding the movement of the Tomlinsons' house.

### d.      Defense Exhibit 30

According to Appellant's brief, defense Exhibit 30 is the declaration of George Bubba Sykes; however, there appears to be some confusion on Appellant's part as to what evidence was marked by his attorney as exhibits during the second phase of the trial and the manner in which his attorney labeled the trial exhibits.  Bankruptcy Docket Sheet entry number 103 indicates that defense Exhibit 30 was offered but not admitted; however, according to the trial transcript for April 17, 2018, defense Exhibit 30 is "the cost detail on September 24th," not the declaration of Mr. Sykes.  R. 2961-64.  As noted, the trial transcript for April 17, 2018, reflects that Appellant's counsel identified defense Exhibit 37 as the declaration of Mr. Sykes, *see* R. 2778, but the document actually marked as defense Exhibit 37 is a copy of the survey plan prepared by Simmons Estate Homes.  *See* R. 2217.  Appellant's brief points the court to page 1963 of the appellate record and Bankr. Doc. 99, which is a copy of the Declaration of George "Bubba" Sykes, but this was merely filed as an attachment to the proposed Supplemental Pretrial Order that was filed by Mr. Clem on April 17, 2018, and denied by the bankruptcy judge on the same date before the second

phase of the trial commenced. R. 2777.  This apparently explains why no exhibit label is affixed to the declaration.

Regardless of the confusion surrounding Mr. Sykes' declaration, the court determines, for essentially the same reasons it stated with respect to defense Exhibit 26, that Appellant has failed to show that he was prejudiced by the exclusion of this evidence. Appellant contends that Mr. Sykes' declaration was wrongfully excluded because it is relevant to explain why "the builder's risk policy had not issued[,] as there was no structure yet to insure at the time of Contract termination[,]" which Mr. Clem asserts was "relevant to show that [the] policy was incurred as a cost[] but would not issue or actually be paid [by Bella Vita] until the project went 'vertical.'" Appellant's Br. 60.

Appellees respond that Exhibit 30 was properly excluded because it was outside the limited scope of the issues for the second phase of the trial identified by the bankruptcy court, and no foundation for the document was laid by Appellant.  In so responding, however, Appellees cite page 2964 of the appellate record, which, as explained, pertains to the discussion during the trial to "the cost detail on September 24th" marked and identified by Mr. Clem's trial attorney as defense Exhibit 30, not the declaration of Mr. Sykes.  *See* R. 2961-64.

Even assuming that Mr. Sykes' declaration was relevant for the purpose asserted by Appellant—to explain from an accounting or insurance perspective why a policy for builder's risk insurance does not normally issue until after construction reaches a point where there is something in the form of "sticks and bricks" to insure against loss, R. 1964— it does not explain why the cost for builder's risk insurance in the amount of $22,415.93 appeared in various cost detail reports that were provided to the Tomlinsons and showed this amount as an expenditure for "invoices received" by Bella Vita before the Tomlinsons' house was "vertical."  R. 1964.  Additionally,

contrary to the Bella Vita's cost detail reports for "invoices received," Mr. Sykes states that his insurance agency Wortham "never formally quoted the builder[']s risk coverage for the Tomlinson Project," "never ordered the builder[']s risk policy for the Tomlinson Project, . . . and a premium was never billed by Wortham" or invoiced. *Id.* Consequently, Mr. Sykes' declaration does not necessarily help Appellant. In any event, the court determines that Mr. Clem suffered no prejudice that would have adversely affected any substantive right because other witnesses were allowed to testify regarding similar matters during the trial.

> **e.** **Testimony of Van Shaw and Jim Jenkins (Accounting Concealment Evidence)**

Appellant contends that the bankruptcy court erred in not allowing Van Shaw, his accounting expert, to testify "regarding accrual of the cost of the builder's risk policy and [Bella Vita]'s accounting procedures for requesting draw procedures," which he argues is "relevant to show [Bella Vita] had the right to seek payment of the draw requests without exhausting the initial deposit." Appellant's Br. 60 (citing R. 2948-2952). Mr. Clem asserts that the bankruptcy court similarly erred in not permitting Van Shaw to testify regarding defense Exhibit 35 "to show that [Bella Vita] provided all requested accounting documents, with back-up invoices for the [P]roject within six weeks" of the Contract being terminated, which he argues is "relevant to show a lack of any concealment of funds and amounts spent on the Project." *Id.* at 61 (citing R. 2977-2980, 2091-2191). Neither of these arguments has any merit.

> **i.** **Opposing Counsel as a Witness**

Mr. Clem attempted to call Mr. Shaw, the Tomlinsons' attorney in the Adversary Proceeding, as a witness in the second phase of the trial to authenticate the documents included in defense Exhibit 35. The bankruptcy court did not allow Mr. Shaw to be called as a witness because

it was "incredibly improper" to call opposing counsel to testify as a witness during a trial, even if just to prove up a defense exhibit. R. 2979. The court finds no error in this ruling. As correctly noted by the bankruptcy court, it is not uncommon for attorneys to testify regarding attorney's fees, but it is not appropriate to call an attorney involved in a case as a fact witness. It is also irrelevant whether the Tomlinsons were provided with accounting information *after* the parties' Contract and business relationship was terminated. Moreover, the bankruptcy docket sheet reflects that defense Exhibit 35 was admitted and proved up by other means through Mr. Clem over the Tomlinsons' objection. R. 2982.

### ii.     Mr. Jenkins' Testimony

Mr. Jenkins was allowed to testify at length during the second phase of the trial over many of the objections asserted by the Tomlinsons to his testimony exceeding the scope of his expert designation as to the general nature of accrual accounting and the accrual of the builder's risk policy on the Tomlinsons' Project. *See* R. 2940-64 (direct examination); R. 2965-74 (cross examination); R. 2974-77 (redirect). Mr. Jenkins read from and testified about the Contract, the draws and draw schedule, the builder's risk policy, and whether he thought the handling of the draws for the Tomlinsons' Project or the inclusion of the builder's risk policy on cost detail reports comported with the Contract or involved fraudulent activity. The small portion of his testimony cited in Appellant's brief (R. 2948-52) dealt with Mr. Jenkins testifying about and reading various contract provisions, which the bankruptcy court permitted up to a certain point before finally not allowing any further similar testimony regarding the Contract and directing counsel to move on to the accounting documents he intended to offer. *See* R. 2951-51 ("I sustain the objection to the extent you're getting the witness to read contract sections."). R. 2949.

**Memorandum Opinion and Order – Page 70**

In so ruling, the bankruptcy court disagreed with counsel's assertion that this evidence was necessary to address the issue of whether Mr. Clem concealed or failed to disclose information as to how the Tomlinsons' initial ten percent deposit and two subsequent draws were spent. The bankruptcy court reasoned that the issue at hand was not a contract interpretation issue but, instead, an issue of what information was or was not shared at different times with the Tomlinsons with respect to how their money was being spent on the Project. R. 2949. The bankruptcy court also disagreed that it was necessary or appropriate to have this witness testify regarding perceived conflicts in the Contract. The bankruptcy court further reasoned that counsel had plenty of opportunities during the first phase of the trial to apprise the court of all the reasons why he believed that the contractual provisions were inconsistent or ambiguous and to argue that evidence outside the Contract was, therefore, needed. *Id.*

The court finds no error in the bankruptcy court's ruling in not allowing Mr. Jenkins to continue reading the contractual provisions and testifying further regarding the meaning of the contractual provisions. Expert testimony regarding the interpretation of a contract is generally inadmissible and invades the province of a court when the contract is unambiguous. *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1096 n.5 (5th Cir. 1995) ("The interpretation of a contract is a question of law for the court. Any reliance on this 'expert' opinion by the court below was misplaced."). Expert testimony regarding a contract is admissible to explain the meaning of contractual provisions having a specialized meaning in a particular industry. *See Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (affirming district court's admission of expert testimony to interpret contract provisions having a specialized meaning in the railroad industry); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 279-80 (5th Cir. 1987) (affirming the admission of

expert testimony to explain accounting provisions in farmout agreement that had a specialized usage and meaning within the oil and gas industry).

There is no indication here that the contractual provisions in this case pertaining to draws had any special meaning in the construction industry. There is also no indication from Mr. Jenkins' testimony or curriculum vitae (Def.'s Exh. 36) that his accounting degree and other experience qualified him to provide testimony in this regard. Instead, it appears that Mr. Clem was attempting to use Mr. Jenkins' expert testimony for the improper purpose of establishing an ambiguity or conflict between provisions in the Contract. Regardless, even assuming that the bankruptcy court erred in not allowing him to testify further regarding the contractual provisions, Mr. Jenkins was allowed to testify at length regarding this and other matters, and Appellant does not explain what further testimony he would have provided regarding the Contract if allowed to do so or why a substantive right of his was adversely affected as a result of Mr. Jenkins not being allowed to provide additional testimony regarding the Contract.

### f.    Mr. Clem's Supplemental Pretrial Order

Mr. Clem does not explain why he believes that the bankruptcy court erred in declining to allow or sign the proposed supplemental pretrial order that he filed on April 13, 2018 (Bankr. Doc. 93, R. 1953). The proposed supplemental pretrial order is not evidence of any sort, and it is unclear how this pertains to Mr. Clem's factual and legal sufficiency argument. In any event, reversal is not warranted on this ground because Appellant has not shown that his substantial rights were adversely affected as a result. *See Crumpton*, 672 F.2d at 1253 (citations omitted); *Greener*, 298 B.R. at 91). Further, the court declines to conclude based on Mr. Clem's general and vague assertions regarding prejudice and due process that the bankruptcy court's ruling in this regard prejudiced his substantial rights.

**Memorandum Opinion and Order – Page 72**

IV.     **Conclusion**

For all of reasons stated, the court **affirms** the bankruptcy court's January 2, 2018 Final Judgment (Bankr. Doc. 75) entered against Defendant-Debtor Steven Andrew Clem in the amount of $683,975.19 and all of the other matters appealed by Appellant, as it finds no reversible error with respect to any of the matters that were appealed and briefed.  Accordingly, the court **dismisses with prejudice** this appeal by Appellant.  Once the court has heard from the parties regarding the applicable prejudgment interest rate, the amount due, and the method of calculation, it will direct the clerk of court to prepare, sign, and enter judgment in accordance with this Memorandum Opinion and Order pursuant to Rule 8016(a) of the Federal Rules of Bankruptcy Procedure.  Any such briefs that the parties wish the court to consider on this issue shall be filed by **October 14, 2022**.  The parties' respective briefs shall include relevant legal authority and must not exceed **seven pages** in length, exclusive of the signature and certificate of service pages.

**It is so ordered** this 1st day of October, 2022.


Sam A. Lindsay
United States District Judge